# Consolidated Coal Company of St. Louis v. Jones & Adams Company.

1. PRODUCTION OF DOCUMENTS—*when properly refused.* It is proper for the court to refuse to require the opposing party to produce documents desired to be offered in evidence, where such documents would have been immaterial if offered as evidence.

2. CONTEMPT—*when failure to obey subpœna duces tecum, not.* A witness is not guilty of contempt in failing to obey a subpœna *'duces tecum* where it does not appear that he was given a sufficient length of time to, comply with such subpœna and that the evidence was material and proper.

3. OPTION CONTRACT—*what not.* A contract which provides absolutely for the delivery and acceptance of a minimum amount of a given article is not violative of the statute prohibitive of option contracts, where it likewise contains a provision for the delivery of a maximum amount of such article at the option of the purchaser.

4. CUSTOM—*when proof of, incompetent.* Proof of a custom material to the issues of a case is ordinarily incompetent in the absence of a specific allegation thereof.

5. OPENING CASE—*discretion of trial court with respect to.* It is within the sound discretion of the trial court to grant or refuse an application for the opening up of a case and the introduction of additional evidence by a party who has rested his case.

6. CONTRACT—*construction of, with respect to requirement of furnishing cars for transportation.* Held, in this case, that notwithstanding the general rule of law, the parties to the contract in question had so acted and had so by their conduct construed the same that the obligation to supply the vehicles of transportation was upon the seller or shipper.

Action in assumpsit. Appeal from the Circuit Court of Sangamon County; the Hon. JAMES A. CREIGHTON, Judge, presiding. Heard in this court at the November term, 1904. Reversed and remanded. Opinion filed April 20, 1905.

LAWRENCE & FOLSOM, FORMAN & WHITNEL and CONKLIN & IRWIN, for appellant.

RUNNELS & BURRY, for appellee.

MR. JUSTICE PUTERBAUGH delivered the opinion of the court.

This is an action in assumpsit by appellant against appellee. Recovery is sought upon a written contract be-

tween said parties, the material portions of which are as follows:

"Said first party (appellee) agrees and contracts to furnish to said second party (appellant) a minimum of 125 tons per day, and a maximum of 200 tons per day, of mine run or lump coal, from their mine located at Springfield, Illinois, during a period of nine months, commencing July 1, 1902, and ending March 31, 1903, at the following prices, f. o. b. mines: 'Lump,' $.95 per ton; 'mine run,' $.85 per ton. Shipments of either grade of coal to be made as ordered by the party of the second part, within the limits of the minimum and maximum quantities as above provided for. Said coal to be good merchantable coal, the lump coal to be screened over shaker screen with holes of not less than one and one-half inches in diameter, and over a screen of not less than fifty-six feet superficial area, and subject at all times to inspection at the mine by a representative of the party of the second part, and in the event of any of the lump coal not being in accordance with the specifications herein provided, party of the second part shall have the privilege of rejecting the coal. Weights as ascertained by the scales at the mine where the coal is loaded to govern settlement, and payments to be made on the 20th day of each month, for all coal shipped during the preceding month. It being understood and agreed that said first party will not be required to furnish coal under this agreement during any portion of the time when prevented by strikes, unavoidable accidents or other causes beyond its control from handling the product of the mine at which the coal herein provided for is produced."

The several counts of the declaration charge that pursuant to said contract, on August 8, 1902, appellant ordered from appellee 125 tons of lump coal per day, to continue until further notification; that on September 13, 1902, it ordered 200 tons per day until further notification; and concluded with an allegation of failure and refusal by appellee to deliver and consequent loss and damage to appellant.

In addition to the general issue two pleas were interposed to the declaration; the second amended, which pleads that appellee was prevented by strikes from furnishing the coal to appellant, and the third, which avers that the

contract in question was void beyond 125 tons per day as being an option contract under section 130 of chapter 38 of the Statutes of Illinois, to both of which pleas demurrers were interposed and overruled.

At the close of the evidence offered by the plaintiff, the trial court, on motion of the defendant, instructed the jury to return a verdict finding the issue for the defendant, which was done accordingly. Judgment was entered upon the verdict in bar of the action and against the plaintiff for costs. To reverse said judgment this appeal is prayed.

As the case was about to be set for trial, a motion was made by appellant for an order of court requiring appellee to produce telegrams and letters between the Chicago office of the appellee and its mine office at Springfield, and also sales books which it was claimed would show, if produced, the prices at which sales were made in the open market between September 1, 1902, and April 1, 1903. The motion was supported by affidavit, asserting that to recover a verdict in this case it would be necessary that the evidence show the difference between the market price and the contract price of the coal in question; that during the period of failure to deliver coal there was a material difference between the purchase price of the coal and the market price of the same coal; that defendant was engaged in the business of mining and selling coal, and that during the period of default in deliveries it sold in the open market large quantities of coal and obtained the market price; that deponent believed that appellee had sold in the open market the coal contracted by it to be delivered to appellant and obtained the market price therefor; that appellee was possessed of certain books that contained evidence as to market price pertinent to the issues in the case, and that appellant desired the same produced on the trial. A counter affidavit of H. C. Adams was filed setting out that if books desired were produced, the appellant, a competitor of appellee, would obtain an unfair advantage of appellee; that the books were large and voluminous and their production would entail unnecessary expense. The motion

was overruled but was subsequently renewed in the same form just prior to the trial of the case and again overruled. On the same day a subpœna *duces tecum* was issued calling upon D. W. Heath, secretary and treasurer of the appellee, to produce the book referred to in the motion, upon the trial of the case. Heath failed to appear and a rule was entered requiring him to show cause why an attachment should not issue against him. In answer to the rule the affidavit of one H. C. Adams and a counter affidavit of one Richard S. Folsom were read, whereupon the rule was discharged.

The evidence discloses that although during the months of September, October and November, 1902, 14,375 tons of lump coal were ordered, only 2,864 tons were delivered; that during December, 1902, and January, February and March, 1903, 20,400 tons were ordered, upon which no deliveries were made. The evidence further shows that owing to a strike among the anthracite miners in Pennsylvania during the summer and fall of 1902, prices for bituminous coal began to rise in September, fluctuated somewhat during that and the following month and then rose rapidly during November and December, reaching the high point at the first of January, 1903, remained almost stationary during that month and slowly receded during February and March, becoming normal or thereabouts at the close of March, 1903.

Upon the trial, appellant offered the contract in evidence. Appellee objected to its admission on the ground that it "was not good beyond 125 tons." The court admitted it in evidence without limitation, but subsequently held that the basis of computation should be restricted to 125 tons per day, and that the contract was competent and admissible to that extent only.

Appellant then introduced evidence tending to show a breach of the contract by appellee and the market prices of coal during the period the defaults in delivery were alleged to have occurred, after which it rested its case. Appellee then offered and asked the court to give to the jury an in-

struction directing a verdict for the defendant on the ground that the evidence failed to support the plaintiff's case. Whereupon appellant asked and obtained leave to introduce additional evidence, and over the objection of appellee, proceeded to introduce in evidence the letters hereinafter referred to. It then offered to show the custom in Illinois among mine owners and operators with reference to by whom cars were furnished, under contracts silent upon the question, and called witnesses for that purpose. Appellee objected to the admission of evidence of this character at that stage of the case. The objection was sustained, plaintiff again rested, and no further evidence was offered.

The appellant contends that the court erred, in construing the contract as an option contract and void as to all in excess of 125 tons; in refusing to enter an order requiring the production of appellee's books; in refusing to require the attendance of D. W. Heath in response to the subpœna *duces tecum;* in refusing to allow in evidence, testimony showing the custom regarding the furnishing of cars; and in instructing the jury to find the issues for appellee.

The refusal of the court to order the production of appellee's books or to punish the witness Heath for contempt for non-compliance with the subpœna *duces tecum* was proper. The affidavit in support of the motion for the production of the books, states that it was proposed to show by them that during the period of default in deliveries appellee sold the coal contracted to be delivered to appellant in the open market at the market price, and further that certain of said books contained evidence as to the market prices pertinent to the issues in the case. The measure of damages in case appellant was entitled to recover is fixed by the rules of law, and whether appellee had sold coal to other parties or what price it obtained was utterly immaterial to the issues involved. Nor would such books have been competent as tending to show the market prices of coal. Such market prices are ordinarily susceptible of proof by the evidence of witnesses, and were, in fact, so proved on the trial. Neither the motion nor affidavit stated that the books were neces-

sary for the purpose mentioned. The ruling of the court, that proper and sufficient cause for making the order was not shown, was therefore proper.

The court was also justified in refusing to punish the witness Heath for contempt, for the reason that sufficient time in which to comply with the subpœna was not afforded him. He was subpœnaed at 8:30 o'clock at night to bring with him practically all the books and many of the papers of a large business and have them in court the next morning at Springfield, Illinois. When the writ was served upon him, he was at his house two miles from the books, which were on the twelfth floor of a building in Chicago. Furthermore, before a witness can properly be punished for contempt in failing to obey a subpœna *duces tecum*, there must be a proper averment by affidavit, of facts showing that the books and papers which the witness was called upon to produce are not only material, but proper evidence in the case. Bentley v. People, 104 App. 353; S. C., 107 App. 245. No such showing was made in the case at bar.

We think the trial court erred in holding that the provision of the contract for the delivery of coal in excess of 125 tons per day was void under section 130, chapter 38 of the Statutes, which reads as follows : "Whoever contracts to have or give to himself or another the option to sell or buy at a future time any grain or other commodity, stock of any railroad or other company, etc., shall be fined, etc., and all contracts made in violation of this section shall be considered gambling contracts and shall be void."

The language of that portion of the contract which it is claimed gave to appellant an option, is as follows: " Said first party agrees to furnish to said second party a minimum of one hundred and twenty-five tons per day and a maximum of two hundred tons per day, etc., shipments of either grade of coal to be made as ordered by the party of the second part within the limits of the minimum and maximum quantities as above provided."

In the case of Schlee v. Guckenheimer, 179 Ill. 593, it

was contended that a contract in the following language was an option contract and void under the statute in question, to-wit:

"Sold N. Schlee five cars of sample B barley at 62c a bushel, delivered Columbus, and five cars sample C barley at 57c a bushel, delivered Columbus. Shipments October 10th and 15th. Term cash. After these five sample cars of each grade have been received, weighed and examined and found satisfactory, Mr. Schlee has the privilege to order 10,000 bushels more of each grade same price, any time to December 31, 1887. If the freight rate is less than 12c a hundred any time between Chicago and Columbus, Mr. Schlee to have the benefit of same. Cars to be loaded not less than 800 bushels."

In its opinion the court says :

"By the contract appellee sold five cars of sample B barley at sixty-two cents a bushel and five cars of sample C barley at fifty-seven cents a bushel, to be delivered at Columbus, Ohio, for cash, shipments to be made on October 10 and 15, 1887. This violated no provision of the statute nor any rule of the common law, and was acted on by the parties and carried out. It was a contract of sale, with a particular time of performance, at a specified price of a particular commodity, to be delivered at a specified place, the failure to comply with which contract by the seller or buyer would authorize the other to have his action for such non-compliance. These five cars of each grade are by the contract declared to be sample cars, and when 'received, weighed and examined and found satisfactory, Mr. Schlee has the privilege to order 10,000 bushels more of each grade, same price, any time to December 31, 1887.' This clause alone does not amount to a contract. It is a mere offer to sell 10,000 bushels each of two different grades of barley, according to sample, at a specified price for each grade, the offer to be accepted by a specified time. The clause does not constitute a contract for an option, such as that in Schneider v. Turner, 130 Ill. 28. The contract in that case was: 'In consideration of one dollar and other valuable considerations,

receipt of which is hereby acknowledged, I hereby agree to sell, etc., 1785 shares of the capital stock, etc., at $600 per share,' etc., which was clearly a contract for an option.

" This proposition or offer is similar to every-day business transactions among the people of this State with reference to every character of commodities purchased for use. The offer to sell such a commodity at a specified price, if accepted by a specified time, does not constitute a violation of the statute. Its acceptance within that time is not prohibited or made a criminal offense, but is an every-day transaction necessary in carrying on business. There is nothing in this contract that is prohibited by the laws of this State, and hence it is not void. Nothing that was said in Pope v. Hanke, 155 Ill. 617, would require us to hold its provisions void. In that case the court found that the contract then before the court was a mere gambling contract, and was prohibited by the policy and laws of this State."

In Osgood v. Skinner, 211 Ill. 229, in discussing the question whether the contract there involved was an option contract within the meaning of the statute, the court says: " It is the duty of courts to enforce contracts or award damages for their breach, and it is generally sufficient to authorize a recovery if the evidence shows that one capable of contracting has entered into an agreement upon sufficient consideration. Such a contract is not to be strained for the purpose of bringing it within a criminal statute."

We think the views expressed by the Supreme Court in the cases cited, are applicable to the question under consideration, and therefore hold that the contract here involved was valid in all its parts.

It will not be necessary for us to determine whether or not evidence of a general custom relative to the furnishing of cars by mine owners or operators, if the same were sufficiently established, would ordinarily be admissible in aid of the construction of the contract under consideration. In the absence of any averment of such custom in the declaration, the question cannot be raised upon this record. In Leggat v. Sand's Ale Co., 60 Ill. 158, the court says: " A

particular custom must be stated in the declaration, and the rules, as to stating customs, are the same in pleas as in declarations, only greater strictness is required in pleas." See also, McCurdy v. Alaska, etc., Co., 102 Ill. App. 120; Mobile Co. v. Judy, 91 App. 82. Moreover, no evidence pertaining to such custom was offered by appellant until after it had rested its case. Whether or not after it had closed its case and the motion by appellee to direct a verdict had been argued, it should have been permitted to introduce further evidence and the character and extent thereof, was a matter clearly within the sound discretion of the trial court. In the absence of clear abuse of that discretion, and none appears here, the action of the court in that regard is not reviewable. This rule of law and practice is so well established as to need no citation to support it.

It is insisted by appellee that its failure to deliver the coal according to contract was due to the lack of cars at its mines; that it was the duty of appellant under the contract to furnish cars upon which to load the same. On the contrary it is earnestly insisted by its counsel that such duty devolved upon appellee. The question is clearly the most important and vital involved.

The contract, it will be noted, contains no express provision as to which of the parties should furnish the cars. It does recite, however, that appellee agrees to furnish coal at the prices therein named, "f. o. b. mines," the initials or expressions f. o. b. meaning "free on board," and denoting that appellee thereby agrees to deliver the coal on board the cars "without cost to the buyer for packing, portage, carting and the like." (Bouv. Law Dict.)

The evidence shows that during the months of July, August, September, October and November, some 218 cars were loaded at the mines by appellee and shipped to appellant.

Upon the trial the following letters and telegrams from appellee to appellant's sales agent at Chicago, bearing the dates mentioned, were introduced and admitted in evidence:

September 20. "Instructions have been given the mine that will give you good shipments next week."

October 4.   " Replying to yours of the 3rd, we shall be glad to furnish you 200 tons of lump coal from our Springfield mine every day we get cars to do so.   You understand, of course, we have some other contracts, and that the car supply is bad.   We will divide the cars fairly and come as near filling your orders as we possibly can.   We are advised by wire to-day that we have four Wabash cars and one C., P. & St. L.   This has been a very bad week for us as State fairs generally cause our mine to be idle three or four days during the week."

October 16.   " Beg to state that the mine has been instructed to make more liberal shipments to you.   We, of course, have a great flood of other orders, most of them contracts, and we have been unable to give you as much coal as we would like to.   Think, however, we can increase shipments and will do our best to accomplish this.   We cannot give you any coal at Chicago or Peoria via C. & A., as we are entirely obligated for what cars we get in that direction."

October 22.   " We regret to advise you that we have been unable to increase our shipments much to you lately, owing to the very bad car supply we have been getting.   The Wabash have been furnishing us very few cars and the C., P. & St. L. have done but little for us.   We have a number of other contracts on these roads and when the cars are divided up it does not enable us to take care of any one of them as we would like to.   We are continually after both of these lines for cars, and hope to be able to make you better shipments shortly."

November 7.   " We have been and are now getting a very scant supply of Wabash cars at our Springfield mine, and we have not been getting very many C., P. & St. L. cars lately.   We propose to fill our contract with you during the month of November if the car supply will permit and we shall use every effort to get cars.   We can only ask your further indulgence and do our best for you."

It appears from the foregoing correspondence that appellee ascribed its failure to make deliveries to the inability to procure cars, and that no request was at any time made of appellant that it should furnish cars, nor was complaint made that it had failed to do so, nor was any offer made by appellee to deliver upon condition that appellant would supply the necessary cars.

Counsel for appellee contend that in the absence of any

special provision as to who should furnish the cars, the contract must be governed by the general rules of law in such cases. That under such rules there is no ambiguity in the contract and no necessity for construction thereof by the court by the aid of the contemporaneous acts of the parties. Counsel for appellant, on the contrary, contend that inasmuch as the contract does not definitely determine which party should furnish the cars, that appellee having assumed the duty to supply them and having done so, by its acts showed that it understood that such was its duty. They invoke the well-established rule that "it is permissible in construing a contract, to look to the interpretation that the parties thereto have placed thereon, in its performance, for aid in ascertaining its true meaning" and that "no extrinsic aid can be more valuable." Slack v. Knox, 213 Ill. 195. That "where the parties to a contract have given it a particular construction, such construction will generally be adopted by the court in giving effect to its provisions; and the subsequent acts of the parties showing the construction they have put upon the agreement themselves are to be looked to by the court, and in some cases may be controlling." Merrifield v. Canal Commissioners, 212 Ill. 471.

While it is undoubtedly true, as contended by appellee, that as a general rule, where a contract for the sale of a commodity provides that the same is to be delivered free on board railroad cars or vessels, and where the contract is silent as to by whom such cars or vessels are to be furnished, it is the duty of the purchaser to furnish the vehicle of transportation (Hocking v. Hamilton, 158 Pa. St. 107; Kunkle v. Mitchell, 56 Pa. St. 100; Chicago Lumber Co. v. Comstock, 71 Fed. Rep. 477; Baltimore, etc. v. Steel Co., 123 Fed. Rep. 655; Davis v. Mining Co., 170 Mass. 391; Evanston El. & C. Co. v. Castner, 133 F. R. 409), it is also the law that where the contract does not definitely determine which party shall furnish the vehicle of transportation and the parties themselves have by their acts and conduct given the same a particular interpretation, and one of the parties has without objection or protest assumed

such duty, thereby lulling the other into a sense of security, such party is estopped to claim a different construction.

In Crown Coal Co. v. Yoch Coal Co., 57 Ill. App. 666, it is said: " The appellee brought suit and recovered damages for the failure of appellant to comply with a written contract entered into between the parties. Appellee was operating a coal mine and on the 16th day of June, 1892, sold to appellant ' the entire output of lump coal ' of its said mine, agreeing to furnish not less than a certain number of cars of coal weekly, at a certain price, between certain fixed dates, for which the appellant agreed to pay at a certain fixed time. The contract does not definitely determine which party should furnish the cars, but the appellant furnished the cars for all the coal that was delivered, and thereby placed a construction upon the contract in this respect, to which it cannot now object."

In Consolidated Coal Co. v. Schneider, 163 Ill. 393, which was an action by Schneider against the coal company to recover damages for its failure to accept and pay for coal, the court says: " The contract contains a provision in regard to the delivery of the coal, as follows: ' All f. o. b. cars at said mine'—which, as the evidence shows, means free on board the cars at the mine. The fact that appellees were required by the contract to deliver the coal free on board the cars at the mine can have no bearing on the question in regard to whose duty it was to furnish cars. The furnishing of cars at the mine to be filled with coal was an independent matter in no manner connected with the duty of filling the cars. When the cars were furnished, then it devolved on appellees to fill them free of any expense to appellant, but until the cars were furnished they were required to do nothing except to have the coal ready. It being the duty of appellant to furnish the cars under the contract, its failure to discharge that duty was a clear breach of the contract, for which appellees, who were ready and willing to furnish the coal, were entitled to recover."

While the foregoing quotation upholds the general rule

invoked by appellee, such conclusion of the court is not in-consistent with the views expressed in the Crown Coal Co. case, *supra*, inasmuch as the court, in the Schneider case, further says : " The contract is silent in regard to the party who shall furnish the cars, but the plaintiffs proved by a number of witnesses that before they commenced mining coal under the contract, Emery, the superintendent of the coal company, came into the mine and inquired if they were prepared to fill the contract. They asked him about cars, and he replied : ' I will see that you get cars. I will see that they put in six cars a day and I will look to you to fill them.' In addition to this testimony it was proven that appellees repeatedly called on the superintend-ent for more cars, and he never denied that it was the duty of appellant to furnish them, but, on the other hand, he promised to furnish cars or made excuses for appellant's failure to furnish them. It was also proven that at no time while appellees were occupying the mine under the contract did they procure or furnish any cars, but all that were furnished and filled came through appellant. From these facts it is apparent that the construction placed on the con-tract, both by appellees and appellant, was that appellant was required by the contract to furnish cars. In the con-struction of a contract it is always allowable to look to the interpretation the contracting parties place upon it, either contemporaneously or in its performance, for aid in ascer-taining its meaning."

In C. & G. E. Ry. Co. v. Vosburgh, 45 Ill. 311, where a contract for the building of an embankment was under consideration, it is said : " It is true, the contract is silent as to which party was to furnish the earth, but the parties themselves gave a construction to the agreement, and they should be bound by it."

We are of opinion that the evidence adduced by appellant establishes a *prima facie* case and that the trial court erred in directing a verdict for the defendant. It follows that the judgment predicated thereon must be reversed, and the cause remanded for another trial.

*Reversed and remanded.*