RANDALL v. SPRAGUE et al.

(Circuit Court of Appeals, First Circuit. May 1, 1896.)

No. 136.

1. DEMURRAGE—LAY DAYS—IMPLIED CONTRACT.
    Where there are no agreed demurrage days for loading, the case is one for a breach of an implied contract to load with reasonable diligence.
2. SAME—CHARTER FOR COAL CARGO—USAGE OF PORT.
    A vessel chartered to carry a cargo of coal from Baltimore *held* chargeable with notice that, by the usage of that port, coal was not stored there, but was to be loaded from the cars, so that the usual strict obligation to have the cargo on hand did not exist, in all respects.
3. SAME—OBSTRUCTION BY ICE.
    Demurrage for detention beyond a reasonable time, in loading, is not to be refused because, even if loaded on time, the ship would have been prevented, by ice, from sailing earlier than she did.

Appeal from the District Court of the United States for the District of Massachusetts.

This was a libel in admiralty by William M. Randall against Charles H. Sprague and others to recover demurrage. The district court dismissed the libel (67 Fed. 604), and the libelant has appealed.

Eugene P. Carver (Edward E. Blodgett, with him on brief), for appellant.

Charles T. Russell, for appellees.

Before COLT and PUTNAM, Circuit Judges, and NELSON, District Judge.

PUTNAM, Circuit Judge. This is a libel for demurrage, or for unreasonable delay in loading the schooner Louise H. Randall with coal at Baltimore in January and February, 1893. One position of the vessel owner is that it was agreed that her loading should be completed on January 18th, but we are of opinion that this claim is not sustained, and that there was no obligation except to load in a reasonable time after her return was secured. There were no agreed demurrage days for loading; though there were for discharging; so the case is one for a breach of the implied contract to load with reasonable diligence.

It appears that the libelees were the owners of the cargo, and chartered the vessel through their agent at Baltimore, so that there can be no doubt they are liable for the detention, if any one is. Some questions arose about the pleadings, but the libelees press no issue on that account, and the case was finally submitted to us on whatever state of facts the evidence maintains.

It is evident that the vessel was chargeable with notice that, by the usage of the port, coal was not stored at Baltimore, but was to be loaded from the cars, so that the usual strict obligation to have the cargo on hand prior to commencing loading did not exist, in all its particulars. It is also plain that the master was chargeable with the understanding that he was to take his turn at the wharf where the vessel was to be loaded. His turn did not commence until January 20th, on which day he received 300 tons, and he testifies that he did not receive any more for five or six days.

The libelees claim that the railroad over which the coal was arriving was obstructed by unusual cold and storms, and to such an extent that it was impossible to get cargo. The parts of the record which they claim sustain this proposition have been examined, and none of them are found to contain any legal evidence to that effect. No person who was on the line of the road, or at the mine, testified; and no officer of the railroad corporation was a witness, nor any one who could state the circumstances in such way as to enable the court to see how far they could have been overcome by reasonable diligence. Moreover, the correspondence put in by the libelees tends strongly to prove that the difficulty in getting coal enough to load this vessel, which, in comparison with the extent of the traffic, was a very small amount, arose in some part from the fact that the shipper had not taken proper precautions to obtain cars seasonably.

It is claimed that in this case the question of demurrage is strictly one of unliquidated damages. There is no doubt it is so, as there

was no stipulated demurrage. Again, it is claimed that there were no actual damages, because the vessel, if she had been loaded, could not have sailed sooner than she did, on account of a continued blockade of the harbor by ice. The court directed this last proposition to be reargued, and has given it very careful consideration. We think it is well proven that the Randall could not have gone to sea sooner than she did, except that possibly she might have been towed out at a disproportionately large expense. Even this is not clear. Nor is it clear that the vessel could properly have thus risked her cargo. This brings us to the question of law raised on this point. The libelees refer us to an expression of this court in Railroad Co. v. Church, 7 C. C. A. 384, 58 Fed. 600, 602, as follows:

"As a general rule, courts of admiralty have allowed the demurrage stipulated in contracts of charter party and bills of lading. This would certainly be the rule unless the loss to the shipowner is shown to be less."

But tnat, undoubtedly, referred only to the general rule that an agreed rate of demurrage ordinarily controls the rate for a period of detention which the agreed rate does not cover, and to cases like The Gazelle, 2 W. Rob. Adm. 279, where deductions were made because the vessel in that particular case was free from certain usual port or voyage charges. The libelees cite no instance in which the rule claimed by them has ever been applied; yet there must have been an innumerable number of cases where, on account of adverse winds lasting for some time, existing where and while vessels were detained for loading, it would have applied, if sound. The proposition opens up an unlimited field, as there would seem to be at least equal reason for permitting proof that the port of destination was so blockaded with ice that the vessel could not have arrived if she had sailed, or that adverse winds prevailed which would have obstructed her voyage. It thus illustrates that, inasmuch as courts cannot easily estimate all the contingencies of navigation, therefore, in maritime matters, rusticum judicium is often given, and arbitrary rules often prevail. It is true, as claimed by the libelees, that there is in this case no express contract right, nor the strict obligations arising therefrom (Leggett, Charter Parties, 601); yet cargo owners loading a vessel have, in some sense, the use of her while loading, and ought to pay for that use. Carv. Carr. by Sea (2d Ed.) §§ 630, 631, lays down the undoubted rule, by virtue of which, if the Randall had been unreasonably detained by the charterers, and could easily have sailed during the early part of that detention, but had been also detained, after her lading was completed, because the harbor had become blockaded by ice during the latter part of her detention by the charterers, and because the blockade continued thereafter, she could not have recovered for this additional detention. To the same effect is Abb. Shipp. (13th Ed.) 271, 274. Jones v. Adamson, 1 Exch. Div. 60, cited in Abb. Shipp., at pages 297 and 338, turns on a different principle. This illustrates the rusticum judicium to which we have referred, and also illustrates that propositions of the class of that under consideration should not be permitted to be used to a vessel's loss, as they cannot be availed of in her behalf. In Pringle v. Mollett, 6 Mees. & W. 80, 82, the charterers voluntarily paid into

court damages for a few days' detention under the circumstances of the case at bar; but the report does not show whether this was in accordance with maritime usages, or was merely precautionary, to avoid the risk of litigation over a comparatively small sum. Cases of collision are not exactly analogous; yet in a note to 2 Pritch. Adm. Dig. 1764, it appears that, on a claim for demurrage preferred by the owners of a vessel which was windbound at the time of collision, the registrar and merchants refused to enter upon speculations as to the probable delay in the ship's progress, even if no collision had occurred. This was not appealed to the court.

On the whole, while the claim for detention sounds in damages, we think the charterers had the substantial use of the vessel while engaged in loading her, and ought to pay for it. Moreover, the proposition which the charterers present is without precedent, so far as we can discover; and, in view of the infinite variety of maritime contingencies and possibilities, it invites us to a field of speculation, in this and other probable cases, which the practical rules of the admiralty courts are intended to avoid. We think the vessel is entitled to the equivalent of five days' demurrage, at the rate stipulated between the parties for demurrage at the port of discharge. The decree of the district court is reversed, and the case remitted to that court for further proceedings in harmony with the opinion passed down this day, with costs for the libelant in both courts.