JAMES A. DAVIS & another *vs.* COLUMBIA COAL MINING
COMPANY.

Suffolk.   November 19, 1897. — February 28, 1898.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Sale — Conditional Contract — Action — Vendor and Vendee — " Strike."*

Where a contract is made for the delivery of a cargo of coal at G. for shipment,
upon the condition that the seller is not to be "responsible for loss of coal *en
route,* nor for damages from delays of transportation, strikes, or causes beyond "
his control, if, before the coal reaches G., and while it is on a railroad, the rail-
road corporation seizes and consumes it, there being at the time a great scar-
city of coal caused by a serious strike at the mines, although the corporation
afterwards pays the seller for the coal the same price which the buyer has
agreed to pay for it, the buyer cannot maintain an action against the seller for
the non-delivery of the coal.

Where a contract is made by which the seller of goods agrees to deliver them free
on board at a certain place, it is ordinarily the duty of the buyer to furnish a
vessel, and the seller is under no obligation to act if the buyer does not pro-
cure the vessel.

If a contract for the sale of coal is made upon the condition that the seller is not to
be responsible for damages from delays of transportation or " strikes," this word
is not to be restricted so as to apply merely to the case of a strike at the seller's
own mines, but includes any strike having a legitimate tendency to prevent the
execution of the contract, if the seller was in the exercise of due care and
diligence.

CONTRACT, to recover damages for the non-delivery of a cargo
of Henrietta bituminous coal. Trial in the Superior Court, with-
out a jury, before *Hardy,* J., who allowed a bill of exceptions,
in substance as follows.

The plaintiffs were wholesale coal dealers in Boston, and the
defendant was engaged in mining and shipping bituminous coal,
with its principal office in Philadelphia. The plaintiffs, on April
13, 1894, sent to the defendant a written order for one cargo of
Henrietta bituminous coal, under which six hundred tons at two
dollars a ton were to be delivered " f. o. b.," Greenwich, Phila-
delphia, for shipment to Salem, which was afterwards by mutual
consent diverted to Boston, and was the cargo in question.

On April 14, 1894, the defendant wrote to the plaintiffs as
follows: " We expect to arrange to get the cargo to Salem off

next week. The rates to-day are seventy to seventy-five cents to Salem for this draft of water. We think we shall be able to get a vessel at seventy cents. . . . Every one is excited over the strike, and all our regular customers here have ordered large extra shipments, which we are bound to take care of, as many of them are under contract. We have two other cargoes to load besides your Salem order, which will take all the coal we have to spare from this mine if the men strike next Saturday, which it is more than likely they will do. . . . On your Salem order you say 'price as agreed'; this we understand to be two dollars f. o. b. Greenwich, subject to five cents commission to you."

On April 16, the plaintiffs telegraphed: "Ship Henrietta Salem straight seventy cents."

On April 20, the defendant wrote: "We are sorry to inform you that our miners at three different mines quit work last night, and the prospects are good for all the others stopping to-night. We have arranged for the cargo for Salem, which we will get off as soon as we can get a vessel."

On April 27, the defendant wrote: "The cargo for Salem will go forward promptly. The coal is all on the way, but has been held by the R. R. Co., who have just advised us that they would release it, and if that is the case we will take up the first vessel that offers."

On April 28, the plaintiffs wrote: "Your wire of even date received this morning, saying, 'Can we pay 75¢ Salem? Rates advancing. Answer.' To which reply was made, 'Cannot pay over seventy Salem, chartered yesterday at that figure.'"

On April 30, the defendant wrote: "Will do our best to charter a vessel for you at 70¢ to Salem, and can likely do so before long. The one we were offered at 75¢ is still unchartered, but will not take less; for us to guarantee prompt shipments at all times is out of the question, and we would do it for no one. We can only agree to use our best efforts, subject to all strikes, short car supply, or any other delay beyond our control."

On May 1, the plaintiffs acknowledged the receipt of this letter of April 30, and in reply wrote: "Trust you will be able to secure a vessel in the very near future @ 70¢ for Salem. A vessel was chartered last Friday for 70¢, 600 tons capacity. Think we wrote you this before. We think you rather misinterpreted

the meaning of our letter.  Of course, any agreement regarding the shipment of coal that you might enter into with us would be subject to riots, strikes, damage by water, or any other unforeseen casualty.  We do not mean to be unreasonable, and hope you do not think so."

On May 2, the defendant, in reply to this letter of May 1, wrote: " We know of the vessel that was chartered last Friday, but unfortunately did not hear of her until she had been taken.  We are on the lookout and will take up the first one we can find, as the coal is all here waiting for you.  There is no change in the situation as regards the strike."

On May 3, the plaintiffs, in reply to this letter of May 2, wrote: " Hope you will be successful in securing a vessel for the Salem order without much further delay."

On May 4, the defendant, in reply to this letter of May 3, wrote: " We are advised there is quite a fleet of vessels coming up the river to-day.  We do not know just what they are, but hope we may be able to find one for your Salem order. . . . The Salem shipment will take all the coal we now have on hand, and I assure you it has been hard work for us to keep this for you, as we are besought by other parties to let them have it, every day."

On May 7, the plaintiffs telegraphed, " Divert Salem cargo and charter vessel at once, Grand Junction Wharf, Boston.  See letter."  And on the same day they wrote, " We wired you to-day as follows: ' Divert Salem cargo and charter vessel at once Grand Junction Wharf, Boston.  See letter,' which we now confirm.  Give us as large a cargo as you can under the circumstances, and make the best charter possible, and forward at once."

On May 7, the defendant wrote: ." We have between five and six hundred tons of coal here for your Salem order, but up to this time have been able to find no vessel that is willing to go at your limit of freight.  If we attempt to hold the coal here much longer, we fear the Railroad Co. will take it.  We could have sold it a number of times at a price very much higher than we sold it to you, but have held the coal for you in order to keep our word.  Can you not charter a vessel at your end, or raise the limit of freight, so that we can get the coal off? —

P. S. Your telegram just received. We will look for your letter in the morning and act accordingly."

On May 8, the defendant, in reply to the plaintiffs' letter of May 7, wrote: "We have your letter of the 7th inst. In reply would say there are several vessels unloading here now, and we think we will be able to get off in the course of a day or two your small cargo for Boston."

On May 10, the defendant wrote: "It seems we are fated in not being able to make a shipment of coal to you. We were able to secure a vessel this morning, and when we ordered her to go to Greenwich to load, we were informed that the railroad company had seized all the coal on their road and would not allow any vessels to be loaded. This is on account of the strike in the Cumberland region. I have just been over to see them to try and have the coal released. They say they may be able to do so in a day or two, but cannot say definitely until they know something further about the strike in the Cumberland region. They promise me, however, that they would not move this coal from Greenwich, and at the first opportunity there is to release it to us, will do so. We will not relax our efforts to get it off."

On May 16, the defendant wrote: "We are very sorry to say that we have been notified by the railroad company that they have used all the coal they seized. We understand they are very short of coal, and are using all the coal that comes on their road, and have put a number of their engines on anthracite coal. We are very sorry this occurred, but it was beyond our power to prevent it."

Robert Mitchell, the manager of the defendant company, called as a witness by the plaintiffs, testified that, upon receiving the plaintiffs' order for the six hundred tons, the defendant used every possible effort to obtain a vessel within the limit of freight fixed by the plaintiffs, but was unable to do so; that the freight limit was removed by the plaintiffs in their letter of May 7; that the witness succeeded on May 10, as stated in his letter of that date, in arranging with a vessel then in the stream to proceed to Greenwich to load, but before signing the charter party he learned of the seizure of the coal by the Pennsylvania Railroad Company, while in course of transportation over

that road; that the coal had not reached Greenwich when the Pennsylvania Railroad Company seized all of it, being twenty-four car-loads, and applied it to its own use, and subsequently paid the defendant therefor the same amount the defendant would have received from the plaintiffs; that during all the time covered by the matters in controversy a serious strike existed at the mines from which the coal in question was obtainable; that all coal sold by the defendant to the plaintiffs before and since the contract in question had been billed upon bill-heads containing the following words: "We are not responsible for loss of coal *en route,* nor for damages for delays of transportation, strikes, or causes beyond our control"; that this particular lot of coal had not been billed to the plaintiffs; and that, in transactions with the plaintiffs, bills were sent as soon as the defendant received the bill of lading from the railroad company, when coal was loaded on the vessel.

The defendant introduced evidence that it was a universal custom in 1894, throughout the coal trade, that all sales of bituminous coal were subject to the conditions quoted above from the defendant's bill-head, and which were included in the regulations of the Seaboard Steamship Association, an association of coal shippers only, to which the plaintiffs did not belong.

The defendant requested the judge to rule as follows:

"1. Upon all the evidence, the plaintiffs are not entitled to recover. 2. The contract was subject to the conditions stated on the defendant's bill-head. 3. The performance of the contract was prevented by a strike, and the plaintiffs cannot recover. 4. The seizing of the coal by the Pennsylvania Railroad Company was a cause beyond the defendant's control, within the meaning of the condition to which the contract was subject. 5. The performance of the contract was prevented by a cause beyond the defendant's control, and the plaintiffs cannot recover. 6. The procuring of a vessel by the plaintiffs or their agents was a condition precedent to the loading of the coal on board the same by the defendant. 7. If the delay in chartering a vessel was due to the plaintiffs, and if, before the vessel was chartered, the coal was seized by the Pennsylvania Railroad Company, the failure to ship the coal did not constitute a breach of the contract on the part of the defendant."

The judge refused all the above requests except the second, and found as a fact that the contract was made subject to the conditions referred to in that request; and found for the plaintiffs. The defendant alleged exceptions.

*B. L. M. Tower,* (*E. O. Hiler* with him,) for the defendant.

*J. A. Brackett,* for the plaintiffs.

LATHROP, J.   The contract upon which this action is brought is not an absolute contract, by which the defendant agreed to deliver the coal free on board at Greenwich, Philadelphia, at a particular time, but, as the judge who tried the case in the court below has found, is subject to certain conditions, namely, that the defendant was not to be responsible for loss of coal *en route,* nor for damages from delays in transportation, strikes, or causes beyond the defendant's control.

The evidence shows that the coal had not reached Greenwich, but was *en route* on the road of the Pennsylvania Railroad Company when that company seized it, and consumed it, there being at the time a great scarcity of coal caused by a serious strike at the mines.   The coal was thus lost to the defendant, by a cause for which, by the terms of the agreement, the defendant was not to be responsible.   While the defendant afterwards was paid by the Pennsylvania Railroad Company for the coal the same price which the plaintiffs had agreed to pay for it, we do not see that this has any bearing upon the case.

Nor do we see that the defendant was under any obligation to furnish another cargo of coal under the contract.   Where a contract is made by which the seller of goods agrees to deliver them free on board at a certain place, it is ordinarily the duty of the buyer to furnish a vessel, and the seller is under no obligation to act if the buyer does not procure the vessel.   *Armitage* v. *Insole,* 14 Q. B. 728.   *Sutherland* v. *Allhusen,* 14 L. T. (N. S.) 666.   *Dwight* v. *Eckert,* 117 Penn. St. 490.   *Hocking* v. *Hamilton,* 158 Penn. St. 107.   In the present case it was no part of the contract of the defendant to furnish a vessel, although, acting for the plaintiffs, it attempted to procure one at the rate of freight to which it was limited by the plaintiffs, but did not succeed.   On May 7, three weeks after the order was given, the freight limit was raised by the plaintiffs, and the defendant, on May 10, was able to procure a vessel, and was then informed

that the coal had been seized. On May 16, the defendant was informed that the coal had been consumed, and this fact was communicated to the plaintiffs. It does not appear from the bill of exceptions that any request was afterwards made by the plaintiffs of the defendant to ship another cargo under the contract, or that anything further was done in regard to it. Both parties apparently considered the matter at an end.

It also seems to us clear, on the evidence, that the performance of the contract was prevented by a strike; and we see no reason why the word "strikes" should be restricted so as to apply merely to the case of a strike at the defendant's own mines. It is broad enough to include any strike having a legitimate tendency to prevent the execution of the contract, if the defendant was in the exercise of due care and diligence. See *Milliken* v. *Keppler*, 4 App. Div. (N. Y.) 42; *Delaware, Lackawanna, & Western Railroad* v. *Bowns*, 58 N. Y. 573.

We see no ground upon which the defendant could be held liable.　　　　　　　　　　　　　*Exceptions sustained.*