W. K. NIVER COAL CO. v. CHERONEA S. S. CO., Limited. SAME v. URSULA BRIGHT S. S. CO., Limited. SAME v. NEW RUPERRA S. S. CO., Limited. SAME v. JONES.

(Circuit Court of Appeals, First Circuit. December 7, 1905.)

Nos. 533, 534, 535, 536.

1. SHIPPING—DEMURRAGE—LAY DAYS—CONSTRUCTION OF CHARTER.
    While under the modern rule, which gives the charterer of a vessel for the carriage of coal, ore, grain, or other like commodities, for which special facilities for loading and discharging are in general use, the option to select the berth at which the vessel shall load or discharge within reasonable limitations, and which subjects her to the necessary delay in awaiting her return without demurrage, the customary charter provisions that lay days shall commence when the vessel is "ready to unload and discharge" and "written notice is given" have no effect, except from the time the vessel reaches the precise berth where she is ordered; but a provision in a coal charter that the time for discharging should commence when the vessel was ready to unload and written notice given, "whether in berth or not," was evidently intended to relieve the vessel from the burden of such rule, and the clause must be given effect in ac-

cordance with its plainly expressed meaning, and the lay days for discharging commenced when the vessel gave notice that she was ready to unload and was ready, whether at her designated berth or not.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 589–592.

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

2. SAME—EXCEPTION IN CASE OF STRIKES.

Where, in consequence of a strike of the anthracite coal miners of Pennsylvania, large quantities of coal were brought to American ports from Wales and other coal mining regions by vessels, and because of the arrival of a large number of such vessels at a given port at about the same time, and the further requirement of consignees that they should discharge at certain railroad docks to facilitate the shipment of the coal to interior points by rail, delay was caused to many of the vessels in discharging, the strike cannot be held a proximate cause of such delay, within the meaning of a charter provision exempting the charterer from liability for demurrage on account of delay caused by strikes.

3. SAME—CAUSES BEYOND CHARTERER'S CONTROL.

Delay in the discharge of vessels laden with coal, due to the arrival at the same port at about the same time of a large number of such vessels, each under a separate charter to the same party, was not the result of "causes or accidents beyond the charterer's control," within a provision of the charter parties exempting it from liability for demurrage in such case.

Appeals from the District Court of the United States for the District of Massachusetts.

For opinion below, see 124 Fed. 937.

Hugh W. Ogden, Alexander Lincoln, and Benjamin L. M. Tower (Sherman L. Whipple and Ernest O. Hiler, on the brief), for appellant W. K. Niver Coal Co.

Stephen R. Jones (Eugene P. Carver and Edward E. Blodgett, on the briefs), for appellees.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. These appeals relate to so-called demurrages. The W. K. Niver Coal Company, a corporation organized in Pennsylvania, was the owner of the cargoes aboard the several steamships concerned. The demurrages occurred in the harbor of Boston. The steamships were chartered at Cardiff, Wales, in October and November, 1902, during the well-known coal strike in Pennsylvania, to load Welsh anthracite coal for Boston, and there discharge it. Demurrage being demanded in behalf of each of the vessels, and the charters containing the usual cesser clause, the several cargoes became subject to these demands; and, as the coal was owned by the W. K. Niver Coal Company, that corporation claimed it, released it on admiralty stipulations, and answered the several libels now before us. In each case the decree of the District Court was in favor of the libelant, allowing demurrage, and the W. K. Niver Coal Company appealed.

The several charters were each entitled as follows: "Chamber of Shipping Welsh Coal Charter, 1896." Each was apparently of a

standard form, in which the expression "whether in berth or not" occurred, so far as we can discover, for the first time. Charters, like nearly all maritime documents, can be properly construed only when construed historically. The common practice when changes have been desired in charters, marine insurance policies, and other maritime documents, has been to insert into the old body a new clause supposed to have reference to the particular emergency which it concerned. Thus it follows that inconsistent expressions are found in such documents; and so it is in the present case. Scrutton's Charter Parties and Bills of Lading (5th Ed., 1904) at page 22, pertinently says: "It is unnecessary to find a meaning in the particular charter for every word of a common printed form." When a maritime document is studied historically, the necessity of complete reconcilement at times disappears, and what is introduced as new matter masters the rest of the document, on the same principle that written words master the rest of a printed blank deed, or contract, into which they have been inserted.

We will commence with the Roath, chartered to load not exceeding 6,000 tons nor less than 5,800. She did, in fact, load 6,007 tons. No question is made in the assignment of errors as to the amount of demurrage allowed her; and the only issue is whether, under the circumstances, her cargo is liable for any. Her charter provided that she was to deliver her cargo alongside any wharf or vessel or craft as ordered, where she could safely deliver, always afloat; or she might be required to deliver a part at a wharf, and a part at other wharves, and a part into a vessel or other craft, or into other vessels or other crafts. The charter also provided that the cargo should be taken from alongside by the consignee at the average rate of 750 tons per day, "weather permitting, Sundays and holidays excepted," and that, if longer detained, the consignees should pay demurrage. This followed:

"Time to commence when steamer is ready to unload, and written notice given, whether in berth or not. In case of strikes, lockouts, civil commotions, or any other causes or accidents beyond the control of the consignees, which prevents or delays the discharging, such time is not to count, unless the steamer is already on demurrage."

The particular expressions, the construction of which is important, are the following: First, "whether in berth or not," and second, "in case of strikes," "or any other causes or accidents beyond the control of the consignees." The W. K. Niver Coal Company claims that the words "whether in berth or not" do not reach this case; and it further claims that, if its position in that particular is not correct, it was relieved under the circumstances by strikes, or, certainly, by other causes beyond control. Its answer alleges that, while the Roath was in the port of Boston, the harbor was filled with an unusual and extraordinary amount of shipping; that shortly before her arrival a widespread and general strike had existed throughout the anthracite coal regions of the United States, and shipments of coal by rail from those regions to New England had practically ceased; that in consequence thereof, and as the result of the strike, large quantities of coal, shortly before

the arrival of the Roath, arrived in vessels at Boston from the bituminous coal regions of the United States, Wales, and other foreign parts; that, owing to the strike, there was an unusual amount of shipping in the harbor of Boston, chiefly vessels loaded with coal, waiting to discharge; that in consequence thereof it was impossible to obtain promptly a suitable dock, or to obtain lighters in sufficient number to discharge steamships rapidly; that it was impossible to obtain any suitable dock for the Roath sooner than was obtained for her, and impossible at any time during her discharge to provide more lighters than were provided; and that, if there was any unreasonable delay in beginning to discharge the Roath, it was due to the strike, and to causes and accidents beyond the control of the consignee occurring before the Roath was on demurrage. The answer further states that, when notified of the arrival of the Roath, the W. K. Niver Coal Company was advised by her agents that, on account of her draught, she could not be berthed at Mystic Wharf, being the dock where she discharged the bulk of her cargo, which it alleges was the only suitable dock, and the only dock at which railroad connections could be had whereby the coal could be transported to the several vendees of the W. K. Niver Coal Company; that her agents, therefore, required the steamship to be lightened before being berthed at Mystic Wharf; that thereupon the W. K. Niver Coal Company secured a dock where a portion of her cargo was discharged, that is, the West India Fibre Company's Wharf; that thereupon the Roath proceeded to that berth and unloaded 500 tons, more or less, of her cargo; that she then went to Mystic Wharf, where she discharged the remainder into railroad cars; that the facts already rehearsed resulted in an unprecedented congestion of railroad traffic and coal cars on all the railroads centering in the port of Boston, so that it was impossible for the railroads to provide cars and locomotives in sufficient numbers, or with sufficient promptness, to unload the coal then being delivered at that port; and that the W. K. Niver Coal Company used every effort to procure necessary cars and locomotives from the Boston & Maine Railroad, which corporation controlled Mystic Wharf, to remove the coal discharged from the Roath, but that it was unable to do so; and, indeed, that the Boston & Maine Railroad was unable to provide sufficient cars and locomotives to receive the coal as it could have been discharged from the Roath. These allegations, except as we will otherwise state, and except as they involve propositions of law, are not controverted.

The charter of the Roath was effected on October 1, 1902, by Cory Bros., Limited, described by the W. K. Niver Coal Company as its agent; she arrived at Boston on November 18th; written notice of her arrival was delivered to the consignee the same day at noon; the consignee thereupon ordered the vessel to Mystic Wharf; the agent of the steamer reported at Mystic Wharf on November 19th, when there were already in line ahead of her the following vessels, with the following tonnage: Ruth, 965 tons; Ropes, 485 tons; O'Teele, 1,672 tons; Manar, 1,185 tons; Nord Havet, 3,870 tons; Ursula Bright, 4,380 tons; Inch Keith, 4,733 tons; Chatfield, 3,275 tons; Lawrence,

2,091 tons; Borda, 1,216 tons; Palmer, 2,698 tons; Ames, 2,701 tons; Brown, 1,694 tons; Emily, 1,980 tons; Richardson, 896 tons; Talsford, 4,908 tons; Setzer, 1,946 tons; Farmer, 4,221 tons; Elk Garden, 1,575 tons; Thaxter, 1,526 tons; Cheronea, 4,330 tons; Il Pimonte, 6,000 tons; and Arundel. The result was that the Roath was compelled to take her turn behind this long string of vessels, of which two, laden with 8,710 tons of coal, were controlled by the W. K. Niver Coal Company, which corporation claims that, under the circumstances, it could lawfully require her to take such turn.

According to the primitive rule, a charterer who agrees to furnish a cargo for a vessel and to discharge it is bound to have the cargo ready when the vessel is ready, and to receive the cargo immediately on its arrival at its port of destination. This primitive rule applies to all contracts concerning the handling of merchandise, alike of sale, transportation, or bailment of any kind; but, within the last century, in view, partly, of the necessities of coal ports, and of ports for shipment and receipt of ores and grain, and the modern facilities peculiarly provided at terminals for handling the immense masses of such merchandise now required to be handled, this rule has somewhat yielded, as is fully explained in Scrutton's Charter Parties and Bills of Lading (5th Ed., 1904), 17 to 22. This has gone so far that this author says in effect, at pages 259, 260, and 261, that a mere obligation to load or unload imports a stipulation that the work shall be done according to the settled and established practice of the port. Mr. Scrutton says, in effect, at page 260, that it has needed a long series of decisions to accomplish this proposition. The same series of decisions has also established the further proposition that, aside from any peculiar custom, the consignee has a right, to a certain extent to select a particular wharf or berth for discharge of the vessel, although that berth or wharf may be occupied when the vessel is ready to unload, for that reason delaying her; and this not only under charter parties like those now before us containing the words "as ordered," but also where neither these words nor an equivalent expression are found. This is not only the settled law in England, but it is the apparent law in the United States. Accordingly, alike with regard to the port of lading and the port of discharge, large margins are given charterers, which have resulted in long detentions to vessels, extremely burdensome, but for which compensation has been refused. As these appeals do not require us to determine positively the modern application of the rules to which we refer, or to fix accurately their various limitations, we will only refer in a general way to the decisions of this court, and to a single English decision which was practically contemporaneous with the peculiar form of charter before us.

Randall v. Sprague, 74 Fed. 247, 21 C. C. A. 334, decided by us on May 1, 1896, involved a claim for demurrage pending the loading of coal at Baltimore, wherein, at page 248, 74 Fed. (21 C. C. A. 334), we applied the modern rule that, by the usage of the port, coal was not stored at Baltimore, but was to be loaded in turn from cars coming from the mines. Under the primitive rule to which we have referred, the cargo should have been ready when the vessel arrived

at the port. Although she arrived on the 9th of January, and might, if the cargo had been on hand, have loaded in a very few days, the loading was not completed until the 3d of February; and yet she received no allowance for demurrage. This case relates to loading, and not discharging; but it illustrates the difficulties which, under the modern elaboration of rules in reference to lay days, the owners of vessels are struggling to meet. The next case to which we will refer, although not next in the order of time, is Donnell v. Amoskeag Mfg. Co., 118 Fed. 10, 55 C. C. A. 178, decided by us on September 4, 1902. This is in the same class with Randall v. Sprague, a case of loading, and therefore useful only for the same purpose. It not only held the vessel to the customary facilities at Baltimore, but to the customary facilities of a corporation engaged in mining and shipping coal, which corporation the bill of lading provided should load the vessel. At pages 12 and 13 it asserts the binding obligation on both parties of the usages at ports of loading and unloading, whether known or unknown to the contracting parties. In this case the vessel was detained 41 days without any compensation whatever, except in a minor particular, when, if immediately loaded, only 6 days would have been required.

We come next to Evans v. Blair, 114 Fed. 616, 52 C. C. A. 396, decided by us on March 4, 1902. This was a case of discharging a cargo of coal, wherein the bill of lading provided that the vessel should have precedence over all vessels arriving, or giving notice, after her arrival. The Maine Central Railroad Company, the consignee, had three wharves, for discharging coal at Portland, which was the port of discharge. In this particular case, the consignee was held liable for demurrage, although the opinion points out, at pages 618 and 619, 114 Fed. (52 C. C. A. 396), and elsewhere, that the Maine Central Railroad Company had a certain privilege of determining at which of its wharves the vessel should be discharged. As the record did not show the circumstances under which it exercised its option as to the place of discharge, the opinion, at page 619, 114 Fed. (52 C. C. A. 396), quotes with reference to this option the language of Lord Esher, that it is "a power given to the charterer for business reasons"; and it elaborates the fact that this option, given by the law itself, can be exercised only under conditions which are just and reasonable. Its general drift is to the effect that the law is settled that, if the Maine Central Railroad Company had supported its case by an exhibition of facts showing that the discretion used was just and reasonable, the vessel might have been detained for a long time after some vessels subsequently arriving had been discharged, notwithstanding the apparently express letter of the bill of lading to the contrary.

The pith of the result of this class of cases is particularly shown by Sanders v. Jenkins (1897) 1 Q. B. 93, decided on November 6, 1896. This was a striking decision, possibly attracting especial attention, because, while in the prior reported decisions of the English courts the charters contained the words "as ordered," thus on their face in literal terms giving the consignee a certain option with reference to the selection of the place of discharge, that in Sanders v. Jenkins contained no such expression. It is true that that case went

off on the custom of the port, but it was particularly noticeable in the fact that, with regard to the prior decisions giving charterers the option with reference to selecting the place of discharge which we have spoken of, it assumed that they applied, although in the charter then before the court there was no expression "as ordered." It will be perceived that Sanders v. Jenkins was decided the same year in which, according to the caption, the form of the charters before us was adopted; and, as Sanders v. Jenkins concerned an English coal charter, it is not a violent presumption that the two matters had relation to each other. This case is given in Scrutton's Charter Parties (5th Ed., 1904) 103, substantially as stated by us.

Apparently, therefore, the law is as claimed by the W. K. Niver Coal Company, that the former customary words in charters, namely, "ready to unload or discharge," "and written notice given," have no effect except from the time the vessel reaches the precise berth where she is ordered by the consignee to discharge, subject, of course, to exceptions where some special fault rests on him. It is sufficient for us that, in the condition of the authorities, vessels were embarrassed by well-supported claims that they might be detained indefinitely to await their turns, and without compensation. It cannot be doubted that the insertion of the words "whether in berth or not" was intended to relieve vessel owners from this embarrassment and the indefinite losses arising therefrom; and, independently of this, as their clear effect, naturally read, would accomplish that beneficial result, they must be taken accordingly. The W. K. Niver Coal Company looks about for a context and for circumstances to enable it to call on the court to modify these words; but, as they are perfectly clear, they are, as we have said, to be read, and not construed. We must reject their supposed intents suggested by the W. K. Niver Coal Company. None are supported by anything except theories, and each requires the incorporation of additional words before it can be sustained.

As to this particular topic, the case has been pressed on us as though it involved a question whether the consignee had the usual margin with reference to selecting the place of discharge; and it has been urged that, inasmuch as the cases establish that the consignee has that margin, the words "whether in berth or not" cannot receive any construction which interferes therewith. But no question of that nature arises. In Harris v. Jacobs, 15 Q. B. D. 247, decided by the Court of Appeal in 1885, the charter under discussion undertook to afford relief for the vessel by inserting the words "ready quay," in that it provided that she should proceed for her discharge "to London or Tyne dock to such ready quay berth as ordered by the charterers." As under that expression the vessel might, perhaps, refuse to proceed to any berth except a "ready" one, the usual option of the charterer might be interfered with; but the critical expression at bar affects only the demurrage, and not the place of discharge. In this respect it is precisely the same in its nature as though the charter stipulated that lay days should count from the time the vessel cast anchor, or, as the parties might have agreed, from the time she arrived at quarantine. We find, therefore, that the lay days com-

menced, not at the time the Roath was in her berth, but when she gave her notice that she was ready to unload, and was ready, although then in the stream.

The question remains whether the W. K. Niver Coal Company can bring itself within the exceptions relating to strikes or other causes or accidents beyond its control. We will first deal with strikes. It might be expected that we should find as to this some authoritative decisions or expressions of some well-considered text-books; but, so far as we have been able to perceive all those which have been cited to us, and those which we have found, melt away on close examination. The question, of course, is one of proximate or remote cause. That the strike referred to here was a causa sine qua non there can be no doubt. In fact, except for it, the steamers before us would not have been chartered or been in the port of Boston. But several other events came much nearer to the delays in discharging, which, in the eyes of the law, render the strike a remote cause, and mark it as merely a causa sine qua non and not a causa causans.

The W. K. Niver Coal Company relies on the expression following this same strike which closes the opinion in Davis v. Columbia Coal Mining Company, 170 Mass. 391, 397, 49 N. E. 629. There, a sale of coal to arrive from the mines by rail was subject to the exception of its loss en route and strikes. The coal was taken possession of by the Pennsylvania Railroad Company in transit, and used by it. Nobody would doubt that this was clearly within the exception of loss en route, as said in the opinion at page 396, 170 Mass. (49 N. E. 629). That was sufficient to end the case; but, at page 397, 170 Mass. (49 N. E. 629), it was said that the exception was "broad enough to include any strike having a legitimate tendency to prevent the execution of the contract." The opinion referred to Milliken v. Keppler, 4 App. Div. 42, 38 N. Y. Supp. 738, and Delaware Railroad v. Bowns, 58 N. Y. 573. The observations in reference to strikes were entirely unnecessary, and can be regarded as mere dicta. However, on a topic where there is an illimitable number of decisions, the federal courts are not to be controlled, contrary to the most approved authorities, by the expression thus relied on by the claimant, with reference to a charter made, not in Massachusetts, but abroad.

Returning, therefore, as we must, to the fundamental rules of law relating to questions of proximate and remote cause, we have already said that the strike was, at the most, only a causa sine qua non of the difficulties which met the owners of the cargoes of these steamers after they arrived at the port of Boston. Almost without exception, the intervention of human agency, acting voluntarily, severs in law the connection between the supposed cause and what follows it. In this case there were several vital interpositions. First of all, the determination to ship Welsh coal was of such a character. Then the chartering of vessels, either by one shipper or by numerous shippers, so as to bring them into the port of Boston in a bunch, was another. Then the selection of docks and piers at Boston belonging to railroad corporations for the special purpose of reaching the vendees of the shippers of the coal was still another; and the whole from beginning to

end was so far removed, incidentally and otherwise, from the strike, that it is difficult to comprehend how anyone could maintain that the strike was, in the eyes of the law, the cause of the demurrage now claimed. Bacon laid down the rule of proximate cause in terms which have remained steadfast with considerate authors and courts, as follows:

"It were infinite for the law to consider the causes of causes, and their impulsions one of another; therefore, it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree." Brown's Legal Maxims, *202.

In Insurance Company v. Tweed, 7 Wall. 44, 51, 52, 19 L. Ed. 65, an explosion in a building which caused a fire therein, and which fire spread to another building on the opposite side of the street, was held to be the cause of the latter fire within the meaning of an insurance policy. In that case there was no intervening human agency, but an unbroken progress of events arising out of what might be expected from the continuous operation of natural laws. Mr. Justice Miller, speaking in behalf of the court, says it would be an unprofitable labor to enter into an examination of the authorities on this topic. He continues as follows:

"One of the most valuable of the criteria furnished us by these authorities is to ascertain whether any new cause has intervened between the fact accomplished and the alleged cause. If a new force or power has intervened, of itself sufficient to stand as the cause of the misfortune, the other must be considered as too remote."

This expression of Mr. Justice Miller has been repeated by the Supreme Court several times, the last in The G. R. Booth, 171 U. S. 450, 455, 19 Sup. Ct. 9, 43 L. Ed. 234, so that it must be conceded that it has the full support of that tribunal. Even where there has been no intervention of a free human agency, the Supreme Court sometimes holds that the first of two events, between which has occurred a long series of other events, cannot be regarded as a proximate cause. In Scheffer v. Railroad Company, 105 U. S. 249, 252, 26 L. Ed. 1070, it appeared that Scheffer was injured in a railway accident, and that he thereby became disordered in mind and body, and, some eight months thereafterward, committed suicide. The court held that his own act, suicide, was the proximate cause of his death, and that his representatives were not entitled to recover. At page 252, 105 U. S. (26 L. Ed. 1070), the opinion, rendered by Mr. Justice Miller in behalf of the court, says:

"The argument is not sound which seeks to trace this immediate cause of the death through the previous stages of mental aberration, physical suffering, and eight months' disease and medical treatment, to the original accident on the railroad. Such a course of possible or even logical argument would lead back to that 'great first cause least understood,' in which the train of all causation ends."

Scheffer v. Railroad Company was cited and commented on in Washington Railroad Company v. Hickey, 166 U. S. 521, 528, 529, 530, 17 Sup. Ct. 661, 41 L. Ed. 1101. Therefore, we are compelled to conclude that in no sense will the rules of law which we are required to administer regard the exception of the strike named in the charters applicable on the records now before us.

The only matter now remaining is the effect of the words in the charters, "or any other causes or accidents beyond the control of the consignees," etc. Of course, the burden rests on the W. K. Niver Coal Company to point out specifically the facts on which it relies in connection with any exception, and to support them by proper proofs. The fundamental error on the part of the W. K. Niver Coal Company with reference to this particular topic arises out of the fact that it insists always that it had a right, which we have explained existed under the older form of charter parties, to select, within a reasonable margin, the berth for discharge, even though the Roath might thereby have been put in to take her turn behind a long list of vessels, as was in fact done. The citations which we have made from the answer explain at length these propositions in this particular; but, as we have shown, the expression "whether in berth or not" renders all this irrelevant. What the W. K. Niver Coal Company desired to accomplish, as appears by its answer and, also, in the record, was to send the Roath to a wharf where her cargo could be transferred directly into cars, in order to reach its vendees at various points on the line of the Boston & Maine Railroad. That it could not otherwise reach them promptly afforded, under this charter party, no excuse, and was not anything beyond the control of the consignee within any interpretation which can be lawfully given here. On the other hand, and undoubtedly for this reason, the record fails to show that the W. K. Niver Coal Company made thorough efforts to discharge this coal at either of the wharves hereinafter named, or that, if it had made the attempt, it could not promptly have succeeded in unloading at some one of them. Observing in this connection that as to each of these appeals it is agreed that the court may turn to each and all the records, the evidence shows that there was abundant water at each of these wharves, and that several of the steamers to which these appeals relate were there discharged, wholly or in part. The W. K. Niver Coal Company asserts, nevertheless, that there was a deficiency of lighters necessary for thus discharging the vessel. It has failed to maintain the burden on this point. Indeed, the preponderance of the evidence seems to be the other way. However, even if there had been an insufficienccy of wharves or of barges or lighters, that was not a matter beyond control, but a condition to which the consignee had contributed. It had four large coal steamers involved in these appeals, voluntarily bunched together in the port at Boston; and the case of the steamship Lake Michigan, disposed of at our last term, shows another even larger steamer for which it was responsible, in port at the same time. The Roath, as we have said, had a cargo of 6,007 tons, and arrived on November 17th; the Bright, 4,380 tons, arrived on November 11th; the Cheronea, 4,300 tons, arrived on November 17th; the Banana, 3,390 tons, arrived on November 29th; and the Lake Michigan, 8,504 tons, arrived on November 7th. These were all discharging, in whole or in part, after the Roath arrived; and, taken all together, they discharged without delay at various wharves into lighters more than the cargo of the Roath. The Lake Michigan discharged on November 19th 742 tons.

It will be remembered that the Roath reported on the 18th, and the stipulated rate of discharge per day was 750 tons. The Roath, several days before her turn came at the Mystic Wharf, was berthed at the West Indies Fibre Company's Wharf, and 500 tons of coal were there discharged into lighters. The Bright was berthed at the same wharf on November 20th, two days after the Roath reported, where 700 tons of coal were discharged into lighters, being almost the required daily amount for the discharge of the Roath. The Cheronea was berthed at Commonwealth Dock the day after the Roath reported, and between that time and November 29th, which was 13 days before the discharge of the Roath was completed, 2,905 tons were discharged at that dock. The Banana, which arrived at Boston on November 29th, was ordered that day to proceed to Commercial Wharf, where she was attended by several lighters—two of 250 tons each, one of 450 tons, one of 150 tons, and one of 175 tons—as well as by the barge Edith, 1,500 tons, and the barge Robena, 575 tons; and, as we understand it, her whole cargo was thus discharged before the discharge of the Roath was completed. Thus, while the Roath was delayed, more than her entire cargo was discharged into lighters from other steamers chartered or controlled by the W. K. Niver Coal Company. Its own vessels, or vessels under its control, were given facilities which, if concentrated on the Roath, would have discharged her seasonably.

The same course of reasoning is to be applied to all the steamers involved in the appeals before us. Each of them had her own rights as against the W. K. Niver Coal Company. They were not under a joint contract, but each was under a separate contract; so that each was entitled to assert her rights independently of the others, although the consignee had so involved itself by its several charters, or by charters on its account, that it was unable to do its duty by any one of them. A condition of affairs brought about by a contractor on the one part does not relieve him from his obligation to each of the contracting parties on the other part, acting severally, because the condition resulted in embarrassing all of them at the same time. To consent to any other rule would permit a contractor to relieve himself from his contracts in proportion to the number of parties he might involve in his own embarrassment by virtue of his own separate voluntary acts.

But assuming all the conditions to be as claimed by the W. K. Niver Coal Company, it might well be questioned whether they come within the exception in this charter party, "other causes or accidents beyond the charterer's control." In other words, in view of the expression "whether in berth or not," was this vessel required to take her turn? The Arbitration, 1 Q. B. 261 (1898), has been interpreted and annotated by Mr. Scrutton in his Charter Parties and Bills of Lading (5th Ed., 1894; page 183, note g). He holds it to be one result of that case that the words "other causes beyond the charterer's control" are to be construed ejusdem generis with what precedes them. Mr. Scrutton also points out that, as the result of The Arbitration, this expression in any charter party cannot go so far as to relieve the charterer merely because the vessel is obliged to wait her turn. This proposition may have enlarged force on the char-

ter of the Roath. It is a well-known fact that, with the present modern methods of loading and discharging, charterers of vessels rarely control the opportunities of doing either. Consequently, the necessity of loading in turn is something which is usually beyond the control of the charterer; so that, if the conditions which compel a vessel to wait her turn are to be held to relieve the charterer under this charter party, the expression "whether in berth or not" may be so far nullified. As, however, it is difficult to apply these words to all possible phases of the various parts of the exceptions which follow them, and, as it may be unsafe to go beyond the emergencies of any particular case in attempting this, and as, in view of the facts which we have explained, it is not necessary to determine sharply the questions of construction suggested, we will not now venture to do so; but in any view, so far as the Roath is concerned, we are of the opinion that the conclusion of the District Court was correct.

The W. K. Niver Coal Company attempts a minor objection to our conclusions on the ground that the Roath was not, in a strict sense of the expression, ready to unload within the terms of the charter. When she gave notice of her arrival she had been entered at the Custom House, her winches were ready, and her steam was up; but it is said that it does not appear whether the hatches were off or the derricks rigged. The common knowledge of the ordinary practices in port with reference to vessels arriving compels us to regard this objection as finical.

The appeal as to the Roath disposes of the appeals as to the Ursula Bright and the Cheronea; the circumstances with regard to the three steamers being practically the same. This leaves only the Banana, which, as we have said, discharged entirely into lighters. Her lay days commenced on the first day of December, and, on the principles which we have applied to the other steamers, they should have ended at the close of December 5th. Every claim as to her is disposed of by what we have already said, except that it is alleged in behalf of the W. K. Niver Coal Company that there was a snowstorm on the 5th entirely preventing discharging that day, and also a condition of weather on the 9th which necessarily shortened the working hours. The steamer was, perhaps, not entitled to demurrage for the 5th; but, in view of the expression in her charter which we have already cited, "unless the steamer is already on demurrage," no rebate can be made by us for the 9th. Indeed, on general rules, the same would probably be true as to any day after the vessel's lay days had once expired. The fundamental difficulty, however, is that the record fails to show definitely how the District Court computed demurrage in favor of the Banana, so that we are unable to revise the details thereof.

It is assigned as error that interest was allowed by the District Court on the several demurrages. This allowance is so just, and so clearly within the federal rules in regard to the discretion which the admiralty courts, whether of the first instance or on appeal, are authorized to exercise in this particular, that we do not deem it necessary to make further remarks in regard thereto.

In each case there will be a judgment as follows:

The decree of the District Court is affirmed, with interest; and the appellee recovers its costs of appeal.

ALDRICH, District Judge. I concur in the result. I reach this conclusion with considerable hesitation, and I base my concurrence solely upon the ground that, at the time the contract was made, congestion and delay at the port of discharge must, under the circumstances, have been contemplated by the parties as something reasonably to be expected and likely to occur, and that notwithstanding this the consignees entered into a stipulation for demurrage, and, further, upon the idea that the consignees in an active and substantial way participated in the congestion, and therefore contributed to the cause which occasioned the delay. In other words, the consignees helped to create a situation which they claim should operate to relieve them from their demurrage stipulation.

The consignees having the right to designate the place of discharge, and having designated a certain wharf, I seriously question whether it should be held that they ought, in the emergency, to have resorted to the alternative of receiving the cargoes in lighters, upon barges, or at other wharves where the coal was not wanted. See Crawford v. Wilson (1895) 1 Com. Cases, 154, and the same case on appeal, at page 277 of the same volume; the Milverton S. S. Co. v. Cape Town Gas Co. (1897) 2 Com. Cases, 281; Aktieselskabet Argentina v. Von Laer, 19 T. L. R. 151; Carver's Carriage by Sea (3d Ed.) p. 297, § 258a.

The strike being remote from the immediate cause of delay, that of the congested harbor, to which intervening and independent causes had contributed, relief from the consignees' stipulation for demurrage would come, if at all, under the clause which renders the demurrage stipulation inoperative, when the delay results from "any other causes or accidents beyond the control of the consignees." Under this sweeping form of expression, and in view of its context, I doubt very much whether an efficient cause of delay like the one in question would be excluded from its operation by the doctrine of ejusdem generis.

In this case the delay resulted from a very unusual, if not an unprecedented, congestion of Boston Harbor, and, speaking generally, I should think the congestion was sufficiently potential as a cause of delay to relieve the consignees from demurrage under the exemption clause to which I have referred. But, when the charter party was executed, both parties knew of the strike and of the imperative necessity and demand for unusual and extraordinary shipments of foreign and other coal, and must have contemplated possible, if not probable, congestion and consequent delay at the harbor of discharge. This being so, the parties must have contracted with reference to such delay as a possible or probable incident of the situation. It would thus, upon the whole, at least seem probable that the parties, at the time the contract was made, could not have intended such contemplated cause of possible or probable delay as one which should

suspend the stipulation for demurrage into which they were at the very moment entering. Therefore, in such peculiar circumstances, and upon reasonable construction, it would follow that the congestion was not in the nature of an unforeseen and uncontrollable cause of delay of a character to operate, under the exemption provision with reference to causes other than strikes, lockouts, and civil commotions, as an overthrow of the stipulation for demurrage into which the parties entered.

Moreover, at the time in question, the consignees had several heavy-draft, coal-laden vessels in the harbor, and two or more in the immediate field of the congestion which was causing the delay. As a consequence, the consignees were actively contributing, in a measurable degree, to the creation of a situation which they set up as a ground which should relieve them from their demurrage stipulation Being thus in the rush which created the congestion, they are not in a position to set it up in their own behalf as a cause relieving them from demurrage under the exemption clause to which I have referred.