ANDERSON et al. v. J. J. MOORE & CO.

(District Court, N. D. California. August 31, 1909.)

No. 13,767.

Shipping (§ 177*)—Demurrage—Construction of Charter Party—Arrival of Ship.

Under a charter party of a ship to carry a cargo of coal from New Castle, Australia, to San Francisco, to be there discharged "in the usual and customary manner at any safe wharf or place * * * as directed by consignee," lay days to commence when the ship was ready to discharge and written notice was given, the ship did not arrive at her destination to entitle her to give such notice until she was in the berth assigned and when the master was promptly notified on her arrival that the cargo had been sold to a fuel company and would be discharged at its bunkers, a delay of 42 working days before the ship could there obtain a berth in her turn was at her own risk, it being the custom of the company to discharge each vessel in turn, and the charterer is not liable for demurrage because of such delay.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 576–582; Dec. Dig. § 177.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

In Admiralty. Libel by Andrew Anderson and others, as owners of the ship Columbia, against J. J. Moore & Co. to recover demurrage. Libel dismissed.

H. W. Hutton, for libelants.
William Denman, for respondent.

DE HAVEN, District Judge. This is an action brought by the owners of the ship Columbia to recover $3,264.42 as demurrage for an alleged delay of 42 days in unloading that vessel, under a charter party entered into between the managing owner of the ship and the respondent corporation June 26, 1907. The Columbia carried, under this charter, a cargo of coal for respondent from New Castle, Australia, to the port of San Francisco, arriving in the latter port January 14, 1908, and the next day her master gave notice to respondent, who was also the holder of the bill of lading, of the vessel's arrival and readiness to discharge, and her managing owner was informed, by the respondent, that the cargo carried by her had been sold to the Western Fuel Company, and that the ship "would dock at the bunkers of that company"; that the bunkers were crowded, and the vessel would probably be delayed three or four weeks before she could

reach the place of discharge. The vessel, however, was not given a berth until March 19, 1908.

The reason for this delay seems to have been that prior to that date the bunkers were continuously occupied by cargoes and vessels which had arrived in the port of San Francisco before the Columbia, and it was the general practice of the Western Fuel Company to discharge vessels in the order of their arrival in port, although it appears from the evidence that, during the time the Columbia was delayed, one schooner, which arrived in port after her, was permitted to discharge 300 tons of cargo at these bunkers. But with this exception, the practice of the Western Fuel Company in discharging vessels was to discharge them in the order of their arrival. The Columbia, after reaching the berth assigned her, was discharged at the rate specified in the charter, and the delay of which she complains is that which occurred prior to reaching the berth to which she was ordered.

1. The question for decision here is whether the libelants are, by the terms of the charter party, entitled to recover demurrage for the delay in discharging the cargo of the Columbia under the circumstances above stated. The charter party first provides that the vessel shall load a full and complete cargo of coal at New Castle, and then proceeds:

" * * * And being so loaded shall therewith proceed to San Francisco harbor, California, to discharge at any safe wharf or place within the Golden Gate and deliver the said full and complete cargo, in the usual and customary manner at any safe wharf or place or into craft alongside as directed by consignee.

*      *      *      *      *      *      *      *      *      *      *      *

"Frost or floods * * * or any other hindrance of what nature soever beyond the charterers' or their agents' control, throughout this charter, always excepted.

*      *      *      *      *      *      *      *      *      *      *      *

"To be discharged as customary, in such customary berth as consignees shall direct, ship being always afloat, and at the average rate of not less than 150 tons per weather working days (Sundays and holidays excepted), to commence when the ship is ready to discharge, and notice thereof has been given by the captain in writing; if detained over and above the said laying days, demurrage to be at 3d. per register ton per day."

It will be seen that by the terms of the charter, the respondent, as consignee, had the option to direct the vessel to deliver her cargo at any safe wharf or place within the Golden Gate, or in craft alongside; and I think the evidence shows that the respondent exercised this option on the 15th day of January, 1908, by informing the managing owner of the Columbia that the cargo of the vessel had been sold to the Western Fuel Company, and that she was to be docked at that company's bunkers, although formal written notice directing the master to repair to a berth there provided for the ship was not given until March 16, 1908. The fact that the coal bunkers occupied three separate piers does not render the notice of the place of discharge insufficient, as the bunkers were under one management, and the master of the vessel must have understood that the ship was to be assigned to the first vacant berth at one of the parallel piers, and no more specific designation was requested.

It is the settled rule that the lay days named in the charter or the bill of lading, within which the ship is entitled to deliver her cargo, do not commence to run until she has arrived at her destination—that is, until she has reached the place where she has contracted to deliver her cargo; and, until her voyage has been thus completed, there is no obligation upon the part of the charterer or consignee to discharge her, and the vessel is not entitled to give notice of readiness to discharge.

In Leonis Steamship Company, Limited, v. Rank, Limited, 1 K. B. Div. (1908) 499, the rule for determining when a ship is an "arrived ship"—that is, when it may be said the ship has completed the carrying voyage—is thus stated by Kennedy, L. J.:

"Now, the answer to the inquiry whether the ship can or cannot properly be described as an 'arrived' ship obviously depends upon the point which the parties have chosen to designate in the charter party as the destination. The degree of precision is purely a matter of agreement between them. In practice, the destination is generally one of the following: (1) A port; (2) a specified area within a port, such, e. g., as a basin, a dock, or a certain distance or reach of shore on the seacoast or in a river; or (3) the still more limited and precise point where the physical act of loading is to take place, as, e. g., a particular quay, pier, wharf, or spout, or (where the operation is to be performed by means of lighters, and the ship is not to be in a shore berth) a particular mooring. In each of the last two cases—(2) and (3)—it is settled law that the point of destination is equally to be treated as designated in the charter party, whether the point be named in the document by its local title, or there is in the charter party an express reservation to the charterer of the privilege to fix the point of destination by his order or direction."

Now, as already stated, the Columbia was, upon her arrival at San Francisco, seasonably directed, by respondent, to deliver her cargo at the bunkers of the Western Fuel Company. This direction was given in the exercise of the right given by the charter party, and, under the rule stated in the case just cited, the place so designated is to be regarded as if specifically named in the charter party as the place of delivery; and, this being so, it must be held, under the authorities, that the voyage of the Columbia did not terminate until she reached the berth to which she was directed, and she was not, within the meaning of the charter party, ready to deliver her cargo, or entitled to give notice of her readiness so to do, until that time. Tharsis Sulphur & Copper Co., Limited, v. Morel Bros. & Co., etc., 2 Q. B. Div. 647; Murphy v. Coffin, 12 Q. B. Div. 87.

In the first of the cases last cited, the question arose in an action to recover demurrage under a charter party which obligated the ship to proceed to Mersey, or so near thereto as she might safely get, and deliver her cargo "at any safe berth as ordered on arrival in the dock at Garston." The vessel was ordered to a particular berth, which she was not able to reach for some time on account of its crowded condition, but it was held that the obligation of the charterer to unload did not commence until the vessel was in the berth ordered.

The case of Murphy v. Coffin, 12 Q. B. Div. 87, was an action for demurrage. The charter party provided that the ship was to proceed to a named port and there deliver her cargo "along consignees' or railway wharf or into lighters * * * as ordered." The vessel arrived at the port of destination and was ordered to discharge at the

railway wharf, but, as all of the discharging berths were crowded at that time, she was not berthed at the railway wharf until 24 hours after her arrival in the dock. It was held that the vessel was not entitled to recover for this delay. The decision of the court was put upon the ground that the lay days named in the charter did not commence to run until the termination of the voyage, and that the voyage did not terminate until she was actually in the berth to which she had been directed.

Mathew, J., in delivering the opinion of the court in that case, said:

"It is the ordinary and reasonable rule that the lay days under a charter party do not begin to run until the vessel has arrived at her place of destination. The charter party here seems to have been framed in the hope of avoiding the questions which have arisen in numerous cases as to the respective rights and liabilities of shipowners, charterers, and consignees with respect to the discharge of cargo where the place of destination is a dock. The vessel is to load, proceed to Dieppe, and deliver her cargo 'alongside consignees' or railway wharf, or into lighters, or any vessel or wharf where she may safely deliver, as ordered.' The place of destination is, therefore, such one of these places as the charterers may order. When the vessel arrived in the dock and at Dieppe she was ordered to discharge at the railway wharf, which was then occupied by other vessels, so that there was no berth vacant for her, and it was not until she obtained one that she was in a position to discharge her cargo. * * * I am of opinion that the railway wharf was the only place of destination under the charter party; that the lay days did not begin to run until the vessel had secured a berth there."

In my opinion the rule announced in the foregoing cases is sound, and is therefore to be followed in the decision of this case.

2. But it is further urged, in behalf of the libelant, that, conceding that the charter party gave to the respondent the option of naming the berth for the delivery of her cargo, it was not authorized to name the wharf which the vessel could not reach without the long delay occurring in this case. In other words, the contention of the libelant is, in effect, that the charter party should be construed as only giving the charterer the option to name a ready berth, but I am satisfied, notwithstanding what was said in Williams v. Theobold (D. C.) 15 Fed. 465, that the court is not authorized to import such words into the contract.

It was said by Bowen, L. J., in construing a similar provision in the charter party under consideration in Tharsis Sulphur & Copper Co. v. Morel Bros. & Co., 2 Q. B. Div. 647:

"Then we were told that an option was given to the charterer, and that it was not properly exercised unless a berth was chosen that was empty. But I think there was a confusion in this argument also. The option is given for the benefit of the person who has to exercise it. He is bound to exercise it in a reasonable time, but is not bound in exercising it to consider the benefit or otherwise of the other party. The option is to choose a port or berth or dock; that is, one that is reasonably fit for the purpose of delivery. * * * To limit the option of the charterer by saying that, in the choice of a berth, he is to consider the convenience of the shipowner, is to deprive him of the benefit of his option. The most that can be said is that the charterer does not exercise his option at all unless he chooses a berth that is free or is likely to be so in a reasonable time."

In the construction of charter parties, or bills of lading, it is well to keep in mind the language of Judge Brown in the case of Fish v. One Hundred and Fifty Tons of Brown Stone (D. C.) 20 Fed. 201:

"It is in the power of. the vessel always to provide against any loss on her part through detention from accidental causes at the place of discharge, if such be the intention of the parties, by inserting in the bill of lading the time within which the cargo must be received, or by other familiar provisions, such as that the vessel shall have 'dispatch' or 'quick dispatch,' either of which would cast the risk of delay upon the consignee."

This is particularly applicable here. The charter party was made in view of the fact that many vessels were or might be engaged in the carriage of cargoes of coal to the port of San Francisco, and, where many vessels are entering a port of discharge, the fact that there may be at some time a congestion in the facilities of discharge, because the wharves cannot accommodate all of the ships ready to discharge at the same time, is not so remote a contingency that it ought not to be guarded against by the ship in the contract of carriage, if it is the intention of the parties that the charterer or consignee shall assume the risk of delay from such a cause. This can be done in the manner suggested in the above quotation, or by the insertion of other apt words in the charter or bill of lading, such as that lay days shall commence when vessel "is ready to unload and written notice given, whether in berth or not," which were held sufficient for that purpose in W. K. Niver Coal Co. v. Cheronca S. S. Co., 142 Fed. 402, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126.

The wharf to which the Columbia was ordered by respondent was not free, and the ship was delayed on that account for a period of 42 days, but the court cannot say that the action of the respondent was arbitrary or unreasonable, and therefore not within both the letter and spirit of the charter. The wharf was safe, and one proper for the reception of the cargo, and the option given appears to have been exercised in good faith, for respondent's benefit, and this is all that the charter requires in the matter of designating the place of discharge. The language of the court in Evans v. Blair, 114 Fed. 616, 52 C. C. A. 396, is applicable here. After referring to the cases of Murphy v. Coffin, 12 Q. B. Div. 87, and Copper Co. v. Morel (1891) 2 Q. B. Div. 647, above cited, the court in that case said:

"The result of this class of cases, after some fluctuation, has been to leave the consignee a somewhat unlimited power in the matter of selecting the berth, regardless of its crowded state. provided only it is a safe one. This, however, comes from the fact that the charter party, or bill of lading, contained express language favorable to the consignee, and from the application of the well-known rule that where, in maritime contracts, parties have seen fit to choose fixed forms of expression, the great variety of contingencies incidental to maritime transactions disenable the courts from establishing any safe theory by which the letter can be modified to meet any supposed intent."

It follows from these views that the libel must be dismissed; and it is so ordered.