MOWINCKEL v. DEWAR et al.

(District Court, N. D. California. August 31, 1909.)

No. 13,775.

1. SHIPPING (§ 181*)—DEMURRAGE—ARRIVAL OF SHIP AT DESTINATION—FAIL-
URE OF CONSIGNEE TO DESIGNATE PLACE FOR DISCHARGING.

Where the consignee of a ship's cargo is given the right by a charter
party to designate the place of discharge at the port of delivery either at
a safe wharf or alongside, it is his duty to exercise such option within a
reasonable time after notice of the arrival of the vessel, and his failure
to do so is a waiver of the right and entitles the ship to consider her
voyage at an end and give notice of her readiness to discharge, which
will start her lay days to running.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 592; Dec. Dig.
§ 181.*]

2. SHIPPING (§ 181*) — DEMURRAGE — COMMENCEMENT OF LAY DAYS FOR DIS-
CHARGING.

A ship arrived from Australia in the port of San Francisco with a cargo
of coal under a charter which provided that she should discharge at that
port at any safe wharf or place or into craft alongside as ordered by the
consignee and also for the allowance of demurrage for 12 days. She gave
notice of her arrival on February 4th, and her master was told by the con-
signee to apply to a fuel company which had bought the cargo for orders.
Such application was made, but she received no directions as to a place
to discharge until the 26th, and was then compelled to await her turn. On
the 7th the master gave notice of her readiness to discharge to both par-
ties. Held, that two days was a reasonable time for the consignee to des-
ignate a discharging berth, and that the notice of the 7th started her lay
days to running, and entitled her to demurrage at the charter rate after
their expiration for the ensuing 12 days and to damages in the nature of
demurrage for the detention thereafter, also at the charter rate unless it
was shown, as it might be by either party, that such rate was not the true
measure of the actual damages.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 592; Dec. Dig.
§ 181.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v.
Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

3. SHIPPING (§ 106*)—BILL OF LADING—CONSIGNEE.

When the purchaser of a cargo has the bill of lading issued by the
vessel indorsed to his agent to enable such agent to enter the cargo at
the custom house, and to make sale and delivery thereof, upon arrival,
the owner is to be regarded as consignee, and as such is bound by the
stipulations contained in the bill of lading.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 106.*]

In Admiralty. Libel by J. Ludwig Mowinckel, as owner of the
steamer Rygja, against James Dewar and others for demurrage. De-
cree for libelant.

McClanahan & Derby, for libelant.
Frank & Mansfield, for respondents.

DE HAVEN, District Judge. This is an action by the owner of the
Norwegian steamer Rygja to recover damages for an alleged delay
upon the part of the respondents in unloading that vessel under a char-
ter party, entered into November 30, 1907, at London, between the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

owner and the respondent, Lithgow Coal Association, a foreign corporation. The action is against the Lithgow Coal Association, as charterer, and the members of the firm of Dewar & Webb, as consignees of the cargo carried under the charter.

The libel sets out the charter, from which it appears that the ship was obligated to load a cargo of coal, for the charterer, at Sydney, New South Wales, and carry the same to San Francisco. The charter provided, among other things, that the ship should:

"(4) * * * deliver the said full and complete cargo in the usual and customary manner at any safe wharf or place, or into craft alongside at San Francisco, or other safe place within the Golden Gate, always afloat as ordered by consignees.

"(5) * * * Floods and frosts * * * or any other hindrance whatsoever or wheresoever occurring, affecting * * * the discharge of said cargo * * * or its removal from alongside after discharge, are throughout this charter party always mutually excepted."

"(12) * * * The cargo to be taken delivery of from alongside ship at the average rate of not less than 600 tons per working day (Sundays and legal holidays excepted) from the time the ship is in berth and ready to discharge, and 24 hours' notice thereof has been given by the master in writing, with 12 days allowed on demurrage."

The libel alleges that the Rygja took on board the cargo named in the charter, and arrived at San Francisco February 4, 1908, was duly entered in the customhouse on the same day, and thereupon gave notice to one Evan C. Evans, the agent of the firm of Dewar & Webb, of her arrival and readiness to discharge cargo; and that it was not until February 26th of that year that the master received any order or instructions in relation to the berth to which he was to proceed for the discharge of his cargo.

The original answer of all the respondents denied that the firm of Dewar & Webb was the consignee of the Rygja's cargo, and alleged "that the Western Fuel Company was the consignee of said cargo"; and further alleged that on February 5, 1908, the master of the Rygja was informed by Evan C. Evans, agent for Dewar & Webb, "that the receiver of his cargo was the Western Fuel Company, from whom he was to take orders, under clause 4 of his charter party, and that on the 10th day of February the said master was informed by that company that 'it was to take delivery of the cargo aboard his vessel as per terms of his charter party.'"

The answer was filed October 15, 1908, and on February 17, 1909, the respondents, composing the firm of Dewar & Webb, amended their answer and alleged that the Lithgow Coal Association was the consignee of the Rygja's cargo, and that Evan C. Evans, as agent for Dewar & Webb, was the purchaser of said cargo, "to be delivered by said Lithgow Coal Association to said Evan C. Evans, landed on the wharf at San Francisco; duty paid."

Under the issues made by the pleadings, it is necessary to determine when the Rygja arrived at the place where, under her charter, she had the right to make delivery of her cargo, and also whether the firm of Dewar & Webb was consignee. It appears from the evidence that the Lithgow Coal Association delivered on board the Rygja, at Sydney, 5,346 tons of coal, for carriage from that port to the port of San Fran-

cisco, and for which a bill of lading was issued to the said charterer. Dewar & Webb thereafter purchased the cargo, to be delivered at San Francisco, and thereupon, and as part of the transaction, the Lithgow Coal Association indorsed the bill of lading to Evan C. Evans. The purpose of this indorsement was to enable Evans to enter the cargo at the customhouse, and make sale and delivery thereof at San Francisco for Dewar & Webb. While the cargo was afloat Evan C. Evans, acting as the agent of Dewar & Webb, sold the cargo to the Western Fuel Company, that company to take delivery of the same upon the wharf at San Francisco, the contract also giving the buyer the right to designate the wharf at which delivery should be made.

· The Rygja arrived in the port of San Francisco on February 4, 1908, and, after having been duly entered at the customhouse, her master, on the same day, gave Evan C. Evans the following written notice:

"To Consignees of the Steamer 'Rygja':—I hereby beg to notify you that my steamer 'Rygja' has arrived and entered at the custom house, and ready to discharge at 3 p. m."

On the next day, February 5th, Evans replied to this notice, as follows:

"In answer to your notice addressed 'to the Consignees Steamer "Rygja,"' left at my office yesterday after 3 p. m., I beg to advise you that the receivers of your cargo are the Western Fuel Company, who have a copy of the charter party, and from whom you will please take your orders, under clause four of your charter. The agent of the Lithgow Colliery is Mr. John Barneson, of the firm of Barneson-Hibbard Company, East street, City.

"Yours very truly,                                    Evan C. Evans,
                                "Representative of Dewar & Webb, London."

The master thereupon notified the Western Fuel Company of the arrival of his vessel, but did not receive any direction in relation to a discharging berth. He then gave notice of his readiness to discharge to Capt. John Barneson, referred to in the letter of Evans, as the agent of the Lithgow Coal Association. Barneson replied February 7th, saying:

"I acknowledge receipt of your notice, dated February 4th, 1908. Will notify you as soon as a berth can be obtained for discharging.

"Yours very truly,                                    John Barneson,
                                "Representative Lithgow Coal Assn."

February 7, 1908, the master of the Rygja addressed a joint notice to the Western Coal Company, Evan C. Evans, representing Dewar & Webb, of London, England, Barneson-Hibbard Company, Incorporated, and John Barneson, representing the Lithgow Coal Association, in which he referred to the former notice given by him on the 4th of February; and added:

"I therefore again give notice that at 3 o'clock, p. m. on the 4th day of February, 1908, the Steamer 'Rygja' had entered at the Custom House, in this port, and was ready to discharge her cargo, and that ever since such time she has been and now is ready to make discharge. And I hereby again make demand upon you, jointly and severally, as representing the charterers of the 'Rygja' that you exercise the option given by the charter party, a copy of which I am informed is in the hands of the Western Fuel Company, and designate 'any safe wharf or place, or into craft alongside at San Francisco,

or other safe place in the Golden Gate, always afloat' at which delivery of said cargo may be made."

The next day Evans replied to this letter as follows:

"In answer to your circular letter, a copy of which was left at my office. So far as I am concerned, I have only to refer you to your charter party and to my letter of the 5th inst. instructing you to where your steamer would discharge.

"If you did not ascertain from the Western Fuel Company when you first called on them the particular wharf of theirs that your steamer is to proceed to, I would suggest that you again call on the company and get this information. Yours very truly, Evan C. Evans,

"Representing Dewar & Webb, London."

The Barneson-Hibbard Company also replied, and called the attention of the master to the notice given him by "Mr. E. C. Evans, referring you to the Western Fuel Company, for instructions as to berth, which notice we confirm and repeat."

February 10, 1908, the Western Fuel Company replied, saying:

"We are to take delivery of the cargo of coal aboard your vessel as per terms of your charter party."

February 11, 1908, the attorneys for the Rygja's master addressed a communication to the Western Fuel Company, in which they said:

"As the captain of the 'Rygja' has had contradictory information on the subject, we should be obliged if you will affirm or disaffirm the statement that under clause four, of the charter party, he is to take his orders from you, as the consignees of the cargo. If you affirm this, will you please advise us when you become the holders of the bill of lading, covering this cargo, and also whether the 'Rygja' is to look to you for the payment of her freight and demurrage, and oblige."

In response to this, the Western Fuel Company "denied that it was the consignee of the 'Rygja's' cargo, or the holder of the bill of lading covering the same, and also denied that the 'Rygja' was to look to the Western Fuel Company for her freight."

February 15, 1908, the master of the Rygja was informed by letter from John Barneson, that he had no authority to act for the Lithgow Coal Association in the matter of the Rygja's cargo.

February 18th, Evan C. Evans informed the master of the Rygja, by letter, that he had received a message from Dewar & Webb to pay the Rygja's freight, as per charter party, for account of that firm.

Finally, on February 26, 1908, Evans sent the master of the Rygja the following letter:

"Referring to my letter to you on the 5th inst., I now beg to inform you that I am instructed by the Western Fuel Company to instruct you to take the 'Gymeric's' berth, as soon as she has finished discharging. You will therefore please be careful to see that you follow the S. S. 'Gymeric' and as soon as you are in berth and ready to discharge to give me and/or the Western Fuel Company notice thereof."

The Rygja, on March 13, 1908, reached the discharging berth, to which she was thus assigned, and concluded the delivery of her cargo on the 22d of the same month.

It also appears from the evidence that, at the date of the arrival of the Rygja at San Francisco, there was a controversy between the Western Fuel Company and the representatives of the Lithgow Coal As-

sociation and Dewar & Webb, growing out of the refusal of the Western Fuel Company to receive the Rygja's cargo unless the vendors would undertake to secure that company against any damage which it might sustain in the event that the cargo contained an excess of 20 per cent. of screenings. This controversy was not adjusted until February 8, 1908, at which time the Western Fuel Company finally consented to accept delivery of the cargo, under an agreement then made.

1. The bill of lading, as I construe it, incorporates the terms and stipulations of the charter above set out; and my conclusion is that, although Evan C. Evans, as indorsee of the bill of lading, held the legal title to the cargo of the Rygja until it was delivered to the Western Fuel Company, still he held it as the agent of Dewar & Webb, and that firm was, in fact, the consignee of the cargo, and as such is bound by the stipulations contained in the bill of lading.

2. It will be noticed that clause 4 of the charter obligates the Rygja to deliver her cargo, "in the usual and customary manner, at any safe wharf or place or into craft alongside at San Francisco, or other safe place within the Golden Gate, always afloat as ordered by the consignee"; and clause 5 provides that the lay days are to commence "from the time the ship is in berth and ready to discharge and 24 hours' notice thereof has been given by the master."

In the case of Anderson v. Moore (No. 13,767) 173 Fed. 539, this day decided by me, it was held that similar terms in the charter there considered gave to the consignee the option to direct a delivery of the cargo at either one of the places referred to in the charter, and that when such option was seasonably exercised the ship could not be said to be ready to discharge, nor her lay days commence to run, until she was in the berth, or place designated by the consignee for such discharge, although she might be delayed in reaching such berth by reason of its occupancy by other ships entitled to priority in discharging their cargoes.

The cases of Tharsus Sulphur & Copper Co., Limited, v. Morell Bros. & Co., 2 Q. B. Div. (1891) 647, and Bulman v. Fennick, 1 Q. B. Div. (1894) 179, were decided upon the same principle. In all of these cases the option given to the consignee had been properly exercised.

In passing upon the question, when the lay days of the Rygja commenced to run, it is necessary to first determine when the consignee exercised the option given it by the charter to direct the particular place at which the vessel was to discharge, and my conclusion is that such option was not exercised until February 26, 1908.

The direction given to her master by Evans, as agent for Dewar & Webb, on February 5th, to take orders from the Western Fuel Company in relation to the place of delivery, was not effectual because that company did not, when applied to, give any order or direction in the matter, and, as it appears from the evidence, did not at that time recognize that it was under any obligation to receive the cargo; nor was the subsequent letter of that company, under date of February 10th, stating that it would take delivery of the cargo, "as per terms of the charter party," a sufficient designation of the place where the

cargo was to be delivered. But if this letter should be construed as a designation of the place where the vessel was to discharge, the notice was, in my opinion, too late, because it was not given in a reasonable time after the vessel arrived at San Francisco.

When the notice of the Rygja's arrival and readiness to discharge was given, on February 4th, she had reached one of the alternative places of discharge named in the charter, as much so as if she had been lying at the bunkers of the Western Fuel Company, where she finally discharged, for, whether lying at the one place or the other, her consignee had at that time the right to order her to any other safe wharf or place in the port of San Francisco for the discharge of her cargo.

But the consignee was required to exercise this option, or right given him by the charter, within a reasonable time. Tharsus Sulphur & Copper Co., Limited, v. Morell Bros. & Co., Limited, 2 Q. B. Div. 647. The time for that purpose cannot be extended to meet the convenience of the consignee in negotiating a sale of the cargo, nor, as in this case, in settling a controversy between the consignee and its vendee as to the conditions upon which the latter will receive the cargo.

The evidence tends to show that if the vessel had, upon her arrival, been ordered to the bunkers of the Western Fuel Company, she could not have discharged her cargo at an earlier date than she, in fact, did, because of the occupancy of those bunkers by vessels arriving in port prior to the Rygja; but I do not think this is material in determining the question whether the consignee's option to name the place of discharge was exercised in a reasonable time. The bunkers of the Western Fuel Company were not the only places where the vessel could have been required by the consignee to deliver her cargo, and if it could delay naming one of these bunkers as the place of discharge from the 4th to the 10th or 26th of February, and still retain the option given by the charter, it would have had the right at the latter date to direct the vessel to proceed to one of the many other places referred to in the charter and discharge, if for any reason it had then been the interest of the consignee to so order. The contract does not contemplate that the vessel shall be delayed for so long a time, after her arrival in port, before receiving notice of the place where she is to discharge her cargo.

The failure of the consignee in this case to exercise its option to order the vessel to a place of discharge within a reasonable time was a waiver of the right, and as the vessel was in one of the alternative places at which she might, by the terms of the charter, have been required to deliver her cargo, her master had the right to say that her carrying voyage was then ended, and to give notice of her readiness to discharge. This conclusion necessarily follows from the elementary rule of law that, where a contract provides alternative modes of performance, and gives the right of election to one party, upon the failure of such party to make his election at the proper time, the right to elect the mode of performance passes to the other party.

3. It follows from the views here expressed that the libelant is entitled to recover, and there remains for consideration only the amount of such recovery.

In my opinion the reasonable time within which the consignee was required to exercise the option given to direct the place where the Rygja should discharge expired on February 6th, and, not having been exercised within that time, the vessel is to be regarded as an arrived ship on February 7th; and notice of her readiness to discharge was properly given on that day. Twenty-four hours after this notice —or excluding Sunday, February 9th—her lay days commenced February 10th, and excluding Sunday, February 16th, expired February 19, 1908, after which the libelant is entitled to recover from respondents demurrage for 12 days, at the rate of four (4) pence per register ton per day, as provided in the charter, and damages in the nature of demurrage for each day of the subsequent delay in discharging the vessel's cargo.

The rule of damages, when the ship is detained longer than the agreed number of days on demurrage, is thus stated in section 609, Carver's Carriage by Sea (2d Ed.):

"Damages for detention are generally calculated at the rate which has been agreed upon for the demurrage days, if any are provided for. But either party may show that that is not the true measure of the loss to the shipowner by the detention, and in that case the rate ought not to be adopted."

See, also, Randall v. Sprague, 74 Fed. 247, 21 C. C. A. 334.

I am unable to agree with the contention of respondents that libelant is not entitled to recover damages, in the nature of demurrage, because the ship could not in any event have obtained employment during the period she was detained beyond the 12 demurrage days. The Rygja was, in fact, employed by the respondent during her detention for the storage of coal, and the measure of damage for such detention and use is as stated in the foregoing quotation from Carver's Carriage by Sea.

Let a decree be entered in favor of libelant for damages and costs, in accordance with this opinion, and the case will be referred to United States Commissioner Brown to ascertain and report the amount of judgment to be recovered by libelant.